NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2287-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

CHRISTOPHER REYNOSO,

    Defendant-Appellant.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **April 10, 2026** |
| APPELLATE DIVISION |

Argued December 2, 2025 – Decided April 10, 2026

Before Judges Susswein, Chase and Augostini.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 18-01-0078.

Rochelle Watson, First Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Sellitti, Public Defender, attorney; Rochelle Watson, of counsel and on the brief).

Timothy Kerrigan, Assistant Prosecutor, argued the cause for respondent (Camelia M. Valdes, Passaic County Prosecutor, attorney; Nubar C. Kasaryan, on the briefs).

The opinion was delivered by

SUSSWEIN, J.A.D.

Defendant Christopher Reynoso appeals his jury trial convictions for murder, attempted murder, and weapons offenses stemming from a May 15, 2017, drive-by shooting that resulted in the death of Hansel Castillo and the wounding of Bryan Cabrera. The State alleged at trial that codefendant Nelson Vargas drove the car involved in the shooting, and that defendant, then just two months shy of his eighteenth birthday, fired the gun.

Defendant was waived to adult court and was tried together with Vargas. Defendant contends the trial court committed numerous errors, including by denying his motion to suppress the entirety of the statement he gave to police during his electronically recorded stationhouse interrogation.[1] While defendant steadfastly maintained his innocence throughout the interrogation session, and argued that others may have been involved in the shooting, he unwittingly provided inculpatory evidence by describing the clothing he was wearing on the day of the shooting.

---

[1] Codefendant Vargas challenges his convictions in a separate appeal. State v. Vargas, No. A-1533-22 (App. Div. Apr. 10, 2026). Vargas and defendant raise a number of common trial error contentions. Because we focus in this appeal on defendant's self-incrimination contentions, which Vargas cannot raise, we issue separate opinions. See State v. Baum, 199 N.J. 407, 417 (2009) (holding that a defendant cannot "vicariously assert that another's right against self-incrimination has been violated" under either the federal or New Jersey Constitutions).

Following a suppression hearing, the trial court found that at one point, the detectives did not honor defendant's assertion of the right to stop the interrogation, thus requiring the suppression of statements defendant made after that invocation.[2] See Miranda v. Arizona, 384 U.S. 436, 473-74 (1966) ("[I]f [an] individual indicates in any manner, at any time prior to or during questioning, that [they] wish[] to remain silent, the interrogation must cease."). The trial court declined, however, to suppress statements defendant made earlier in the interrogation, rejecting defendant's contention that the detectives from the outset violated his rights.

Our opinion focuses on whether the State proved beyond a reasonable doubt the voluntariness[3] of defendant's initial waiver of Miranda rights and the statements he made before eventually invoking those rights. Much of our analysis addresses whether defendant's mother was able to safeguard his constitutional rights during the stationhouse interrogation considering her

---

[2] The State did not appeal that ruling.

[3] We focus in this appeal on the voluntariness of defendant's waiver of Miranda rights and ensuing statement, not on whether defendant knowingly waived those rights. Cf. State in Interest of M.P., 476 N.J. Super. 242, 300 (App. Div. 2023) (noting that "proof of voluntariness is analytically distinct from proof of knowledge in applying the 'knowing, intelligent, and voluntary' test for waiving constitutional rights"). See also State v. Gerald, 113 N.J. 40, 109 (1988) (noting that the defendant's arguments that his Miranda waiver was "not knowing and intelligent" and was "not voluntary" were "distinct claims").

limited proficiency in the language in which it was conducted. We also consider the impact of the detectives' failure to afford an opportunity for defendant to consult privately with his mother after the Miranda warnings were administered.

Aside from the issues pertaining to parental participation, we address whether the police impermissibly burdened defendant's Miranda rights when they told him, in response to his question, that he was free to leave—a statement that may not have been true—and in almost the same breath implied that if he stopped the interrogation by asking to confer with counsel, the situation might change as they would need to consult with their "bosses" on whether defendant would be charged and detained. (As it turned out, the detectives decided to arrest defendant toward the end of the interrogation, apparently without receiving instructions from their superiors—suggesting they intended to arrest and charge him all along.)

Balancing the factors constituting the "totality of the circumstances," we conclude that the State has not met its burden of proving voluntariness beyond a reasonable doubt. The combination of factors militating to various degrees against voluntariness—the impairment of the parent's ability to effectively perform an advisory role by reason of her limited English proficiency and the inadequate translation services provided to her; the failure to afford defendant

4                                                                                      A-2287-22

and his mother an opportunity to consult privately following the administration of <u>Miranda</u> warnings; and the detective's seeming misstatement as to whether defendant was free to walk out of the interrogation room and go home, considered in conjunction with the detective's near-simultaneous comment that impliedly imposed a burden on defendant's right to confer with counsel—are too much for the State to overcome when viewed through the lens of the proof-beyond-a-reasonable-doubt standard. That standard erects a formidable hurdle the State must vault. We are constrained to reverse the order denying defendant's suppression motion, vacate his convictions, and remand for a new trial.

I.

<u>PERTINENT FACTS AND PROCEDURAL HISTORY</u>

We discern the following facts and procedural history from the record.

A.

<u>The Crime and Investigation</u>

This case stems from a May 15, 2017, drive-by shooting of several people gathered in front of a residence on Federal Street in Passaic. At 11:15 p.m. that night, a car drove past the residence before turning right onto Burgess Street at 11:16 p.m. The car circled back onto Federal at 11:18 p.m. and passed the home again. On this second pass, someone fired a gun from the

car at the group of people gathered in front of the residence, hitting twenty-year-old Bryan Cabrera and twenty-three-year-old Hansel Castillo.

At approximately 11:21 p.m., several officers from the Passaic Police Department (Passaic PD) were dispatched to the scene on a report of shots fired. The Passaic PD recovered four spent shell casings and a live round from a .22-caliber semiautomatic handgun on the roadway in front of the home.

Cabrera was transported to St. Joseph's Hospital in Paterson for treatment of a gunshot wound to his shoulder; he was discharged at approximately 2:00 a.m. Castillo, who had been hit in the right side of his chest, was taken by a friend to St. Mary's Hospital in Passaic. Passaic PD Detective Michele Merced, the lead investigator of the shooting, spoke with Castillo at the hospital at around 11:25 p.m. Castillo told Merced he had been shot by two men in a four-door gray Nissan Maxima. Castillo succumbed to his wounds the next morning.

After speaking with Castillo, Merced talked to other witnesses who had gathered at St. Mary's. Witnesses consistently reported that the vehicle from which the shots were fired was a Nissan, although they differed on its specific model and color; some said it was gray, while others said it was silver, beige, or gold, and it was variously described as an Ultima or a Maxima. Some witnesses described the car as two-toned, with a black hood.

6

One of Castillo's friends, sixteen-year-old Wilmer Avelino, was interviewed by the Passaic PD in the early morning hours of May 16. He lived at the Federal Street residence and told Merced he saw the shooter's vehicle pass his home once before the incident. Avelino reported that the car came around the block again "right away," and that he heard three or four gunshots as it passed his home again.

Avelino took note of the car because the first time it passed it stopped in front of the residence, and the occupants appeared to look around. Avelino described the vehicle as a gray Nissan with bright headlights, and said the vehicle drove by with the passenger side facing his home. Avelino described the driver of the car as "tall," but said he could not see the passenger clearly because his view was obscured by another vehicle.

At first, Avelino said the car had a New Jersey license plate and that he "saw a Z." He thought it was the first letter on the plate, and said again, "[T]hat's all I saw was the Z, because, like, it was so fast." When Merced asked if he was "sure" it was a "Z," Avelino said, "It was a Z or an S, something like that."

The Passaic PD collected surveillance footage from several nearby addresses via warrants. Video clips and still images from these cameras were compiled into a single video approximately thirty-eight minutes and twenty

A-2287-22

seconds long. Although none of the footage depicted the actual shooting or the Federal Street residence itself, the State argued it showed a car turning right from Federal Street onto Burgess Place at 11:16 p.m. and again at 11:20 p.m. on the night of the incident. Other earlier videos showed what appeared to be the same car traveling from a nearby residence on Howe Avenue at approximately 10:54 p.m. to a nearby gas station on Main Avenue, where it arrived at 11:04 p.m. This vehicle left the gas station at approximately 11:07 p.m., drove the short distance to Federal Street, circled the block, and then returned to the Howe Avenue residence, arriving there at 11:27 p.m. The video showed two people exiting the vehicle and going into the house, then returning about fifteen minutes later and appearing to search the front passenger seat area of the car.

The police also conducted a search of automated license plate reader (ALPR) data in the area, and discovered that ALPRs had captured a Nissan with a license plate beginning with "Z" and a black hood at the intersection of Federal and Burgess twice on May 11, a few days before the shooting, and parked on nearby Howe Avenue on May 16, the day after the shooting.[4]

---

[4] Police learned that the registered owner of the Nissan was Robert Guzman, who had ostensibly obtained the car the day after the shooting. Police determined there was no evidence linking Guzman to the homicide, and he was not arrested.

On May 23, officers executed a search warrant at the Howe Avenue residence and recovered video footage depicting Vargas and defendant at the house. Police also recovered a New Jersey registration and insurance card for a Nissan bearing a plate beginning with "Z," and a driver's license exam permit issued to Vargas.

On May 24, based on the surveillance footage and a tip that included Vargas's Facebook profile, Merced decided to charge Vargas. He turned himself in to the Passaic PD on June 1.

The surveillance footage the Passaic PD collected from May 15 also included a video showing individuals gathered on the street a few houses down from the Howe Avenue residence from approximately 6:50 p.m. to 7:15 p.m., when an ice cream truck arrived. At trial, Detective Raymond Rodriguez identified defendant as an individual wearing two-toned pants in this video. Rodriguez said he recognized defendant from his participation in a Junior Police Academy program when he was ten or eleven years old,[5] and also described interactions the two had at a laundromat in Passaic.

At trial, the State argued that Vargas was the driver of the car in the surveillance compilation video, and that defendant was the passenger. The

---

[5] As noted above, defendant was nearly eighteen at the time the shooting occurred.

prosecutor urged the jury to "look at the pants and examine the pants" to determine who was in the videos.

B.

The Stationhouse Interrogation

Defendant was identified by the Passaic PD as a person of interest after the execution of the search warrant at the Howe Avenue residence and Rodriguez and Merced's review of the video from that location. On June 1, defendant was interrogated by Rodriguez, Detective Alex Flores, and Detective Katie Velarde. Defendant's mother, Lorenza Montiel,[6] was present, and the interrogation was electronically recorded.[7]

---

[6] According to the hearing transcripts, defendant's mother gave her name as "Lorenza Montila" on the first day she testified at the Miranda hearing, and "Gloria Montiel" on the second day. Her name is spelled "Lorenza Montiel" in the transcript of the court's oral decision on the motion to suppress. We refer to her as "Montiel." We mean no disrespect in doing so.

[7] We note that on at least one occasion, the detectives left the interrogation room, during which time defendant conversed with his mother in Spanish while they were alone in the room. Eventually, that conversation was played to the jury. The record does not show whether defendant and his mother were advised that the content of any private conversation between them would be audio recorded. As we explained in M.P., 476 N.J. Super. at 295, this form of eavesdropping would seem to violate the New Jersey Wiretapping and Electronic Surveillance Control Act (Wiretap Act), N.J.S.A. 2A:156A-1 to -37.

Defendant did not argue to the motion court and does not argue on appeal that the stationhouse interrogation was tainted by unlawful electronic eavesdropping. See State v. Aloi, 458 N.J. Super. 234, 243 n.6 (App. Div.

At the start of the interrogation session, Flores asked Montiel if she spoke Spanish or English. Montiel responded, "Spanish." Flores then asked defendant to spell his name and asked whether he could "read and write and understand English." Defendant said he could read English "a little bit." Flores asked whether he wanted to speak in English or Spanish, and defendant answered, "English." After getting some information from defendant about his age and where he attended school, Flores showed Montiel his notes and confirmed with her, in Spanish,[8] that this basic information was correct.

Flores told Montiel in Spanish that he was going to "read something to" defendant, and "want[ed her] to know what [they were] talking about." He said there were currently no charges against defendant, but that he needed to read him his <u>Miranda</u> rights in case he said something relevant to the "case."

_____

2019) (noting an issue not briefed on appeal is deemed waived (citing <u>Jefferson Loan Co. v. Session</u>, 397 N.J. Super. 520, 525 n.4 (App. Div. 2008))). In these circumstances, as in <u>M.P.</u>, we choose not to address whether any portion of defendant's statement should be suppressed pursuant to the Wiretap Act's strictly enforced exclusionary rule. As we noted in <u>M.P.</u>— which was decided long after the 2017 interrogation in this case—the Attorney General and county prosecutors should take precautions to ensure that stationhouse interrogations recorded pursuant to <u>Rule</u> 3:17 are done in compliance with the Wiretap Act. 476 N.J. Super. at 295.

[8] We rely on the State's transcript of defendant's interrogation, which includes English translations of conversations that were originally in Spanish. A version of this transcript was provided to the jury to aid its comprehension while the video of the statement was played during trial.

Montiel replied, "Okay" and "All right." Flores said that at any point, he could "stop everything to explain to [Montiel] more or less so [she would] understand too." Montiel said, "It's okay." Flores gave defendant a <u>Miranda</u> form in English and Montiel a <u>Miranda</u> form in Spanish.

Flores read defendant the <u>Miranda</u> rights, asking whether he understood each of them. Defendant responded "Yeah" after each right. Montiel interjected in Spanish, asking if the <u>Miranda</u> form was for defendant "to fill." Flores started to explain, but defendant interrupted, telling his mother that Flores was "saying . . . the rights [he had]." Defendant told his mother he did not "have to talk" if he didn't want to, and that if he wanted a lawyer the police could "give [him] one for free." Flores said he wanted to "ask [defendant] a few questions to see what he [said]" about what the police were "investigating." He also said that if defendant "[felt] like he need[ed] a lawyer he [could] stop the discussion." Montiel said, "Oh, okay."

Detective Katie Velarde also told Montiel that everything Flores had just explained was "on the paper" Montiel had been given listing the <u>Miranda</u> rights in Spanish. Montiel said, "Ah. Yes, it's okay." Flores said the forms defendant and Montiel had been given were "the same," except that one was in English and the other in Spanish. He asked if Montiel wanted him to read the

form to her in Spanish, but she said, "No. It's okay already." Flores asked, "Are you sure?" and Montiel replied, "Yes."

In English, Flores read to defendant the waiver portion of the form, stating that defendant understood his rights and had come to the decision to waive them "independently of any promises of . . . benefit or reward, threats, coercion or any unlawful influence." Flores asked if defendant understood, and initially defendant said, "No." Flores explained that it meant "nobody's forcing you to talk to me," that defendant understood the portion of the form listing his rights, and that defendant "wish[ed] to continue." Defendant then answered, "Oh. Uh, yeah." Flores further stated that if defendant did not wish to continue, he could tell Flores he wanted a lawyer. Defendant said he wanted to continue and signed the Miranda form. Montiel also signed the English Miranda form.

Defendant then asked, "So, at any point in time if I wanna leave I can leave?" Flores said, in English, that if defendant felt "cornered any type of way" and wanted a lawyer, he could say, "Listen. I want a lawyer. I wanna stop talking to you" and the police would "stop doing what [they] gotta do." Flores said, "My job here is not to make you guilty. My job is to take you out of what we're investigating and show that you have nothing to do with what I'm investigating."

Montiel stepped out of the interrogation room to make a phone call. Defendant then asked Flores again, "So . . . if I wanna leave I could leave, right?" Flores replied, "If you wanna leave you can leave but you must understand that . . . once you say you want a lawyer I gotta talk to my bosses to see what they gonna do with you." Defendant quickly shook his head and said he did not need a lawyer, but asked again if he could "go home" if he wanted to leave. Flores said that this would depend on "what [they] talk[ed] about."

Flores then told defendant he should "say the truth" to "get [him]self out of whatever we're lookin' at," and to not abide by any "street code stuff" about not being a "rat." Defendant once more asked, "But whenever I wanna go I could just go, right?" Flores said, "Well, you gotta tell me you wanna stop and then, like I said, I'll tell my bosses what you decided to do and if they feel that they still [want to] proceed with charges that's on them." Defendant said, "Okay."[9]

---

[9] Toward the end of the interrogation, detectives informed defendant that he was being arrested:

> [Defendant]: Am I being arrested?
>
> [Detective Flores]: I told you a couple of times already.

Montiel returned to the interrogation room, and Flores conversed with her in Spanish again about whether she understood the <u>Miranda</u> form. When she said she had never filled out such a form before, Flores said, "what I'm saying is that in this country you have rights. The police can't just do whatever they want to do." Velarde asked defendant if he wanted her to read Montiel the form out loud in Spanish, and he said, "Yeah. Please. 'Cause she . . . don't know how to read that good." Velarde read the <u>Miranda</u> form to Montiel in Spanish, telling her that defendant had answered "yes" to understanding each right and asking her if she understood, too. Montiel answered "yes" or "okay" to each right. At that point, the detectives advised Montiel and defendant that they were investigating a homicide that occurred on Federal Street on May 15.

---

[Defendant]:  No, right?

[Det. Flores]:  Yes you are.

[Defendant]:  So I'm being arrested?

[Det. Flores]:  Yes.

As we discuss in Section VII.B, this suggests that the detectives may have intended to arrest defendant the entire time, and that he was therefore not free to leave.

During the ensuing interrogation, the officers questioned defendant in English, and he answered in English. Most of this exchange was not translated into Spanish in real time for Montiel. Rather, at various points during the interrogation, they gave Spanish summaries to Montiel of what had been said. Defendant also sometimes spoke to Montiel in Spanish, and the detectives had some exchanges with her and defendant in Spanish as well.

For example, before he began asking defendant about the night in question, Flores told Montiel in Spanish that the police were investigating a homicide and that someone had already been arrested. Flores said the crime was a "shooting" that took place at a Federal Street residence and that "he," meaning defendant, was "the second part" of the investigation. In Spanish, Montiel asked, "He?" and Flores answered, "Yes."

Flores and Velarde then proceeded to question defendant in English about his whereabouts on the day of the shooting, who he was with, and what he was wearing. The officers urged defendant to tell the truth, saying that there was "evidence that brought [them] to [him]" and that his name was "brought up multiple times" by unnamed individuals. When defendant maintained that he took a Percocet pill that night and passed out, the detectives pushed back, saying that defendant "left with somebody that night" and was "either a witness to what happened or . . . the shooter." Detectives exhorted

16

defendant to "save [his] a[**]" and "come clean and explain what happened." Defendant again stated that he took a pill and passed out around 10:00 or 10:30 p.m.

Following this seventeen-minute exchange, during which Montiel was silent, Flores told her, in Spanish:

> Ma'am, um, we're explaining to him that we already know that he has a part in what we're investigating. At this moment he's telling us that he doesn't have . . . anything to do with nothing. But we're going to . . . show him video because there's a video. You know, he says that . . . he was sleeping and we know that he wasn't sleeping.

In another three-minute stretch entirely in English, detectives asked defendant whose car was depicted in the video, told defendant he was "either the shooter or the driver," and suggested he would face a murder charge if he maintained his story.

Later in the interrogation, detectives and defendant spoke to Montiel in Spanish. For example, defendant told Montiel in Spanish, "They're accusing me of killing somebody." Montiel told defendant his friendships were "not good." Defendant asked if she remembered the day when he did not come home until 5:00 a.m. and said he had explained to the officers what he did that day. Velarde told Montiel that the officers would show the two a video to demonstrate that they were not questioning her son "without any reason."

A-2287-22

Defendant said, "She understands," and Montiel said, "Yes." While watching the video, Montiel indicated she could see it fine.

After showing the video, Flores said to Montiel in Spanish that he thought it depicted defendant getting in a car with another man, and that he had asked defendant whether he was "the one driving or the one who shot." He told Montiel that defendant had been "keep[ing] with his thing, 'I don't know. I was sleeping. I was passed out.'" Montiel told defendant, "If you know, you can't be covering up for people." She explained that she had once changed her residence out of fear of someone who had threatened her with violence, and so she was "never in favor of people doing things that are not okay." Defendant said, "I don't have to cover [for] anyone."

After viewing another video, Montiel told the detectives that "it doesn't look like it's [defendant]" in the footage. Flores again told her in Spanish that he believed the video depicted defendant and that detectives had an additional video showing defendant leaving the Howe Avenue residence the morning after the shooting. Montiel told defendant that she did not want him to "get along with [his] friends" by covering for them, because there were "no better friends than [his] mother and [his] brother."

Later, Montiel told the officers that because there were "cameras there," the officers should be able to see defendant sleeping, as he claimed. Flores

18

said defendant was not sleeping, because there was video of him getting out of a car around 11:00 p.m. He told Montiel he wanted defendant to tell him who the other person in the car was, but said he already knew the answer. Montiel asked, "You know who he is?" and Flores replied, "Yes." Montiel said her son had "no enemies" and did not "fight on the streets." After being shown the video Flores talked about, Montiel questioned whether the officers could see the face of the person getting out of the car, because she "[didn't] see anything."

At one point during the interrogation, Flores said to defendant in English, "That's a shame, because she's sitting here. She has no clue what the hell is going on, and you keep thinking that we don't know."

Near the end of the interrogation, defendant urged the detectives in English to check for cameras at the Howe Avenue residence, and Montiel agreed in Spanish without being provided a translation first. Montiel also asked who owned the car depicted in the video, and Flores explained to her in Spanish that the person "who's arrested . . . was driving the car that night." Montiel said the car's owner should "know for sure who [was] inside of the car." Defendant said, "Mom, I'm telling you and them that—" and then retold his account of the day, in which he played basketball, drank alcohol, took a pill, and fell asleep.

## Motion to Suppress Hearing

In January 2018, defendant, along with Vargas, was charged by indictment with murder, N.J.S.A. 2C:11-3(a)(1) and (2); attempted murder, N.J.S.A. 2C:5-1(a)(1) and N.J.S.A. 2C:11-3(a)(1); conspiracy to commit murder, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:11-3; two counts of possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); and unlawful possession of a handgun, N.J.S.A. 2C:39-5(b).

Defendant moved to suppress the statement he gave to police at the stationhouse on June 1, 2017. The suppression hearing was held over the course of eight days in September and October 2019. Detectives Velarde, Flores, and Rodriguez testified for the State, and Montiel testified for defendant.

Detective Rodriguez testified that he brought defendant to the police station from his school and that defendant was not handcuffed at any point in this process. Velarde and Flores acknowledged that Montiel appeared to speak only or mostly Spanish and explained that this was why they spoke to her and read her the Miranda warnings in that language. Velarde said she was not sure whether Montiel understood any English and did not ask. She believed Montiel understood the Miranda rights read to her in Spanish, and Flores also

testified that defendant appeared to understand the rights read to him in English. Velarde said Flores informed Montiel that the detectives were investigating a homicide and that was "why her son was there" just "seconds" after stating the same to defendant in English.

When asked by defendant's counsel what her "responsibility" was to Montiel, given that "questions [were] being asked back and forth but she doesn't speak English," Velarde said, "to translate for whatever . . . she didn't understand." Velarde agreed that detectives only summarized their "back and forth" with defendant periodically, acknowledging that nothing was translated for Montiel "in real time." She further conceded that her summaries were not "word-for-word" translations. Flores agreed that there was no set procedure to decide when to provide a Spanish translation or summary to Montiel.[10] He said that Montiel was nevertheless "in a position to stop the process" because she could say "stop, I want to know what's going on" if she did not understand what was being said in English. In contrast, Velarde acknowledged it would be difficult for Montiel to stop defendant from answering a question if she did not understand it.

---

[10] We recommend that the Supreme Court Committees on Criminal and Family Practice consider whether rules on translation services for interrogations—particularly for parents or guardians of juvenile interrogees—are needed to ensure meaningful participation. See note 15.

21

However, Velarde also said she "wasn't aware that [Montiel] wasn't understanding any words that [the detectives] were saying." She said she periodically summarized the conversation between defendant and the detectives for Montiel in Spanish to "reaffirm[] that she had gotten the gist of what [they] were saying." She testified that "the pertinent information to the investigation [was] most definitely relayed to [Montiel]," explaining that she felt "[a] lot of the stuff" being said by defendant and the detectives "was kind of repetitive" and thus there was no need to "repeatedly relay[]" it to Montiel. She also said that "a big part of" why summaries were provided instead of word-for-word translations was that "[Montiel] didn't seem not to understand." Flores similarly testified that he did not assume Montiel did not understand any English but provided summaries of the conversations in Spanish "because she preferred it in Spanish."

During Flores's testimony at the hearing, the State played the portion of the statement in which defendant mentioned in English the possibility of camera footage from the Howe Avenue house and Montiel responded in Spanish. Flores said that Montiel's interjections seemed responsive to defendant's conversation with the detectives, despite no one translating that portion for her. Velarde and Flores maintained that Montiel did not seem

22

"confused" during the interrogation and never asked the detectives to stop the questioning.

Defendant's counsel asked Flores about his comment during the interrogation that Montiel was "sitting here" with "no clue what the hell is going on." Flores explained that he meant Montiel did not know what was going on "[i]n reference to . . . [the] homicide," not that she "doesn't know what's going on in the [interrogation] room," and that he made that remark in order to get defendant to say more about the case. He added that Montiel maintained eye contact with the detectives and defendant during the questioning in English, and "did say some words to us following what we were talking about."

The English version of the <u>Miranda</u> form signed by defendant and the Spanish version of the form read to Montiel were entered into evidence. Velarde testified that during the interrogation, defendant was permitted bathroom breaks and was given "a meal," and that Montiel was also brought "a snack."

Montiel also testified at the <u>Miranda</u> hearing, with a Spanish interpreter. She said she was born in Mexico, attended school there until the fourth grade, and came to the United States with her family at age seventeen. She did not attend school after the fourth grade because she had to work to support her

23

mother and siblings. She said she spoke Spanish and understood "a little bit, a few words" of English. She also said she did not know how to read or write in any language.

Montiel said that when she was brought to the Passaic PD for defendant's interrogation, she "felt very bad because it was the first time that [she] had to go through [that] situation." She reported feeling "in a state of depression" and "nervous." Montiel said that the police officers spoke to her in Spanish, and that a detective read a form to her about her and her son's rights. When asked if she remembered if she understood the rights, she said, "I think so, yes." She also recalled being told that defendant was being questioned in connection with a homicide investigation.

However, Montiel said she did not understand the detectives' questions to defendant or his answers that were spoken in English. She also said she was "in shock" and "wasn't doing well at the time" because she had "never been in that situation," and so she did not remember much. She said that "at times [the detectives] would explain and then at others [they] wouldn't." She also said she did not try to stop the questioning because she did not "know anything about the law."

Montiel explained that after being read the Miranda warnings, she believed she could stop police from questioning her son "at the beginning," but

could not do so once they started because "they are police officers and they have to proceed." She said again that she could not understand what was being said when defendant and the detectives were speaking English.

D.

Trial Court's Suppression Ruling

On February 11, 2020, the trial court rendered an oral decision, granting defendant's motion to suppress in part and denying it in part. With respect to the portion of the court's ruling granting defendant's motion, the court found that after Flores told him he was being "arrested" and "detained," defendant said, "I wanna stop." The detectives continued their questioning until defendant said, "Can I get a lawyer?" The court found that everything defendant said after he said he wanted to "stop" was inadmissible.

The court found credible Rodriguez's statement that defendant was not handcuffed when he was brought in for questioning, "nor were any promises or threats made to induce" defendant to go to the Passaic PD. The court also found Velarde credible, stating that she "had an excellent recall of the events and command of the subject matter," and "maintained an even tone and demeanor throughout direct and cross-examination."

The court found that defendant was seventeen years old and in the eleventh grade at the time of the interrogation and was not under the influence

of any substance at the time. It found that defendant spoke both Spanish and English, and "for the most part" spoke the former to his mother and the latter to police. It also found that defendant told police he preferred to talk with them in English. The court concluded that Velarde and Flores "properly executed the Miranda rights" with defendant in English.

The court next found it noteworthy that "during the recitation of the Miranda rights . . . [defendant] took extra steps to ensure his mother understood." It recounted how defendant told Montiel he did not "have to talk" and that police would "give [him] a lawyer" if he asked. The court also found that "[t]he police also spoke to [Montiel] in Spanish to ensure understanding." It further found that Flores and Velarde explained the waiver portion of the English form to defendant, again telling him he could ask for a lawyer.

The court concluded that the detectives' procedures fully satisfied the Miranda requirements. It found that Velarde read "each and every question" on the Spanish Miranda form to Montiel, including both the list of rights and the waiver portion of the form. The court further found that it was "clear" that defendant "was not relying on his mom to understand his rights, quite to the contrary." Instead, defendant "explain[ed] to his mom what certain rights meant and what Miranda warnings entailed as he was more sophisticated than

26

her when dealing with these issues." The court also noted that when police asked Montiel if she would consent to a search of her apartment, defendant interjected and explained to his mother in Spanish what the detectives wanted and that she did not have to agree, then urged her to consent.

The court found that defendant was "calm and composed the entire time" he was being questioned, and "[did] not appear to be fearful or [fazed]." It also found that the police never "forced or threatened" defendant, and that there was no evidence he "was suffering from exhaustion or fatigue." Instead, the court stated, he was "extremely animated and at ease with the detectives during questioning" and "relaxed when left alone in the room."

The court further noted that no questioning occurred when Montiel was not in the room. Questioning ceased when Montiel stepped out to use the bathroom or make a phone call. The court found that the detectives questioned defendant "in an appropriate manner using language and techniques appropriate for his age," and that defendant's "answers were responsive to the questions asked, indicating he understood and was able to communicate with the detectives." The court noted that defendant "corrected [the] detectives if they misstated his answers or had inaccurate information."

The court further found that Montiel "credibly testified" that she was not threatened or forced to come to the Passaic PD or to "allow her son to give a

A-2287-22

statement to the police." Regarding Montiel's understanding of portions of the interrogation conducted in English, the court stated:

> [I]nsofar as Ms. Montiel claims she was unable to understand when her son and the police spoke in English, the court finds her testimony somewhat incredible. In particular, [the interrogation video] clearly demonstrates several occasions where Ms. Montiel would interject in Spanish information directly responsive to the questions being asked of her son in English. One particular occasion was when the police were discussing with [d]efendant the placement of cameras in the area where his friend resided. Ms. Montiel interjected in Spanish where certain cameras might be located and for the police to check for footage.

The court found that that defendant "did not need his mother to act as a buffer between him and the police." The court stated that there was "no doubt" that defendant "understood his rights and understood his ability to exercise his rights" regardless of whether Montiel "understood every single word of the conversation between her son and the police." The court found that while there was no "simultaneous translation" into Spanish for Montiel's benefit, "the detectives did take the time to stop periodically and summarize" for her "the sum and substance of their prior questions and answers with her son." The court found that Montiel was present "especially during the critical stage where the <u>Miranda</u> warnings were issued" and that she "[did] not dispute she understood those rights." The court ultimately concluded that the State carried

28

its burden to demonstrate beyond a reasonable doubt that defendant's statement was "the product of free will" and that he knowingly, intelligently, and voluntarily waived his rights and spoke to police.

E.

Jury Trials, Sentencing, and Appeal

The first trial was convened in early 2020. It ended in a mistrial because of the COVID-19 pandemic. A new trial was held over the course of seventeen non-consecutive days in May and June 2022. The jury found defendant and Vargas guilty on all counts.

In December 2022, defendant was sentenced on the murder conviction to a state prison term of thirty-five years with a thirty-year period of parole ineligibility. On his attempted murder conviction, the court imposed a consecutive fifteen-year prison term, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The remaining convictions were either merged for sentencing purposes or ordered to run concurrently to the sentences imposed on the murder and attempted murder counts.

This appeal follows. Defendant raises the following contentions for our consideration:

> POINT I
> THE STATE FAILED TO PROVE A VALID
> MIRANDA WAIVER BECAUSE DEFENDANT DID
> NOT PRIVATELY CONSULT WITH HIS PARENT,

29

THE INTERROGATION WAS PRIMARILY IN ENGLISH DESPITE HIS PARENT'S SPANISH FLUENCY, AND THE POLICE CONTRADICTED THE WARNINGS AND OBFUSCATED DEFENDANT'S TRUE STATUS.

POINT II
THE FAILURE TO REDACT STATEMENTS FROM THE INTERROGATION THAT VIOLATED THE CONFRONTATION CLAUSE AND EXPRESSED THE DETECTIVES' BELIEF THAT VIDEO EVIDENCE SUBSTANTIATED DEFENDANT'S GUILT, DEPRIVED [DEFENDANT] OF HIS RIGHT TO A FAIR TRIAL.

POINT III
THE TRIAL COURT COMITTED REVERSIBLE ERROR BY GRANTING THE JURY UNFETTERED ACCESS TO THE STATE'S SURVEILLANCE VIDEO COMPILATION DURING DELIBERATIONS, WITH NO RECORD OF HOW OFTEN THE VIDEO WAS PLAYED OR WHETHER IT WAS MANIPULATED.

POINT IV
THE IMPROPER ADMISSION OF A POLICE OFFICER'S IDENTIFICATION OF DEFENDANT FROM SURVEILLANCE FOOTAGE REQUIRES REVERSAL.

POINT V
TWO DETECTIVES WITH NO PRIOR KNOWLEDGE OF THE THIRD-PARTY GUILT SUSPECT[11] IMPROPERLY TESTIFIED THAT UNPRESERVED SURVEILLANCE FOOTAGE THEY REVIEWED CORROBORATED THE

---

[11] While not addressed in this opinion, we note that defendant and codefendant Vargas raised a third-party guilt defense at trial.

SUSPECT'S ALIBI, THEREBY PREJUDICING DEFENDANT'S RIGHT TO A FAIR TRIAL.

POINT VI
THE PROSECUTOR ENGAGED IN MISCONDUCT BY MAKING TWO SPECIOUS CLAIMS: ASSERTING, WITHOUT EVIDENCE, THAT [DEFENDANT] HANDLED A GUN IN THE CAR, AND IMPROPERLY VOUCHING FOR THE OFFICER'S CREDIBILITY BY IMPLYING THAT DISCOUNTING THEIR TESTIMONY WOULD BE TANTAMOUNT TO ACCUSING THEM OF A CONSPIRACY.

POINT VII
A RESENTENCING IS WARRANTED BECAUSE THE COURT DID NOT MEANINGFULLY CONSIDER DEFENDANT'S YOUTH AND IMPOSED CONSECUTIVE[] SENTENCES WITHOUT ADEQUATE CONSIDERATION OF THE OVERALL FAIRNESS.

II.

ADMISSIBILITY OF DEFENDANT'S STATEMENT

We focus on defendant's contentions regarding the admissibility of his June 1, 2017, statement to police. We begin by acknowledging the foundational legal principles that govern this appeal, starting with general procedural matters before turning to the substantive constitutional rights at issue.

A.

Standard of Appellate Review

When reviewing a grant or denial of a motion to suppress a statement, we apply a deferential standard of review to the trial court's findings of fact. State v. S.S., 229 N.J. 360, 379-80 (2017). Thus, "[g]enerally, on appellate review, a trial court's factual findings in support of granting or denying a motion to suppress must be upheld when 'those findings are supported by sufficient credible evidence in the record.'" Id. at 374 (quoting State v. Gamble, 218 N.J. 412, 424 (2014)). Stated another way, "[a] trial court's findings should be disturbed only if they are so clearly mistaken 'that the interests of justice demand intervention and correction.'" State v. Elders, 192 N.J. 224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 162 (1964)). The S.S. Court explained that "[p]ermitting appellate courts to substitute their factual findings for equally plausible trial court findings is likely to 'undermine the legitimacy of the [trial] courts in the eyes of litigants, multiply appeals by encouraging appellate retrial of some factual issues, and needlessly reallocate judicial authority.'" S.S., 229 N.J. at 380-81 (quoting Fed. R. Civ. P. 52(a) advisory committee's note to 1985 amendment). The Court in S.S. explicitly extended this deferential standard of appellate review to factual findings that are based on a video recording. Id. at 379-81. See also State v. A.M., 237 N.J.

384, 401 (2019) (noting that "by videotaping their questioning of defendant, police permitted the trial court to review the [interrogation] and assess defendant's overall deportment and conduct as well as the officers' demeanor and conduct throughout the custodial interrogation").

However, we owe no deference to "conclusions of law made . . . in suppression decisions," which we review de novo. State v. Boone, 232 N.J. 417, 426 (2017) (citing State v. Watts, 223 N.J. 503, 516 (2015)). Nor are we bound by a trial court's interpretations of the "legal consequences that flow from established facts." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995); see also State v. Handy, 206 N.J. 39, 45 (2011) (noting that whether established facts warrant suppression is a "purely . . . legal question" subject to plenary review).

Applying these general principles, we review a trial court's determination of whether an interrogee's waiver of rights and statement were given voluntarily as a "mixed" question of fact and law. Cf. State v. Marshall, 148 N.J. 89, 185 (1997) (holding that, in reviewing a mixed question, appellate courts apply de novo review to the trial court's legal determinations but may only reverse its factual determinations if they are "clearly erroneous"). Under the mixed question framework, we accept a trial court's factual findings regarding each of the relevant circumstances that comprise the totality of the

circumstances but review de novo the weight accorded to each individual circumstance in the balancing process, since the weight assignation is essentially a legal consequence that flows from established facts. So too we review de novo the ultimate question of whether the State proved voluntariness to the requisite level of proof: proof beyond a reasonable doubt.

B.

<u>Applying Analytical Rigor to the Totality-of-the-Circumstances Paradigm</u>

We are required on multiple occasions in this appeal to apply the "totality-of-the-circumstances" (TOC) method of legal analysis. That approach is used in various areas of law to evaluate whether a particular legal threshold has been met by assessing the collective weight of all relevant factors in a given situation.

The TOC paradigm is, by design, more flexible and less mechanistic than, for example, the application of a "bright-line" or "per se" rule, or a test that features specified elements, each of which must be proved independently. But that does not mean that TOC analysis is less rigorous than other analytical methodologies. It is much more than a "kitchen sink" approach. While the TOC review process is, by definition, holistic, and necessarily includes subjective, qualitative assessments, it should not be thought of as a visceral, kneejerk, or gestalten reaction to a hodgepodge of relevant factors. As we

34

commented in State v. Cotto, "the totality-of-the-circumstances paradigm is rigorous when used as part of the '"searching and critical" review of the record to ensure protection of a defendant's constitutional rights,'" 471 N.J. Super. 489, 518-19 (App. Div. 2022) (quoting State v. Hreha, 217 N.J. 368, 381-82 (2014)), and that it is "by no means a paper tiger," id. at 519.

Importantly, TOC analysis entails a patient, step-by-step deliberative process. The first step is to identify a circumstance recognized to be relevant under the case law, such as, for example, the absence of a juvenile interrogee's parent. The next step is to determine the weight to ascribe to that circumstance. That critical task must take into account that not all relevant circumstances recognized in the precedents are created equal under the law. Some types of circumstances by their inherent nature—and by operation of case law—are accorded more weight in the eventual totaling process. For example, as we emphasize in Section II.E, our Supreme Court in State v. Presha held that the absence of a parent's participation is a "highly significant" voluntariness factor, adding:

> By "highly significant factor" we mean that courts should give that factor added weight when balancing it against all other factors. By elevating the significance of the adult's role in the overall balance, we are satisfied that the rights of juveniles will be protected in a manner consistent with constitutional guarantees and modern realities.

But that legal principle is only the <u>starting</u> point of the review process with respect to the parental-participation factor. As the facts in this appeal highlight, parental participation cannot always be reduced to a simple yes-or-no question to be checked off on a tally sheet. The point is that while some types of recurring circumstances are deemed as a matter of law to carry highly significant weight, the case-specific facts must be considered in determining whether the full <u>potential</u> weight of that circumstance should be applied when the circumstance is considered in the final totaling step.

Furthermore, in applying TOC analysis to the question of whether a defendant's statement was given to police voluntarily, we must acknowledge that in the real world, an interrogee's inculpatory admissions will rarely be completely involuntary (e.g., extracted by physical or mental torture) or completely voluntary (e.g., made entirely at the person's own initiative and without any form of police inducement, prodding, or psychological pressure). An analogy can be drawn to a hospital pain scale that allows a patient to choose from ascending levels of pain ranging from minor discomfort to excruciating debilitation. Were we to design a similar scale to describe voluntariness, most situations would fall somewhere between the polar extremes. The flexibility inherent in the TOC paradigm allows courts to

A-2287-22

account for such variability in deciding whether the State has overcome the presumption of inadmissibility.

It bears emphasis that the weight-assignment/balancing process at the heart of TOC analysis is not governed by any mathematical formula or algorithm. See State v. Bullock, 253 N.J. 512, 534 (2023) (noting that Fifth Amendment voluntariness factors are "assessed 'qualitatively, not quantitatively'" (quoting Hreha, 217 at 384)). Indeed, the Court in Bullock stressed in the same sentence that "the presence of even one of those factors may permit the conclusion that a confession was involuntary." Ibid. (quoting Hreha, 217 N.J. at 384). That admonition to reviewing courts confirms not only that some circumstances carry more weight than others, but that any factor that strongly suggests involuntariness might justify suppression even when other relevant circumstances militate in favor of admissibility.

Finally, with respect to the rigor of TOC analysis, we note that the process of navigating each analytical step requires a careful and fulsome articulation of a court's findings of fact and conclusions of law. Stated another way, especially in close cases that involve important constitutional rights, both trial and appellate courts applying the TOC paradigm must do more than offer what might be characterized as a "net opinion." Cf. State v. Townsend, 186 N.J. 473, 494 (2006) ("[T]he net opinion rule 'requires an expert to give the

A-2287-22

why and wherefore of [their] opinion, rather than a mere conclusion.'" (quoting Rosenberg v. Tavorath, 352 N.J. Super. 385, 401 (App. Div. 2002))). Simply stated, we are obliged to "show our work."[12]

C.

Basic Rights Against Self-Incrimination and Due Process

Turning to substantive legal principles, "[t]he right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this [S]tate's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." S.S., 229 N.J. at 381-82 (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)). In the landmark Miranda case, the United States Supreme Court "determined that a custodial interrogation by law enforcement officers is inherently coercive, automatically triggering the Fifth Amendment privilege against self-incrimination." State v. P.Z., 152 N.J. 86, 102 (1997) (citing Miranda, 384 U.S. 436). The Court in Miranda devised the now-familiar set of warnings to safeguard the Fifth Amendment's guarantee of the privilege against self-incrimination. Miranda, 384 U.S. at 444, 468-72. In doing so, the Court established a per se rule: the

_____

[12] We note that while we reach a different ultimate conclusion than the one reached by the trial court—applying a de novo standard of review to that legal determination—the trial court's analysis was commendably thorough and detailed.

38

failure to properly administer the <u>Miranda</u> warnings, or the failure to honor an invocation of the right to remain silent or the right to speak to an attorney, automatically requires the suppression of any resulting admission. <u>Id.</u> at 444.

The <u>Miranda</u> warnings are designed to "dispel the compulsion inherent in custodial surroundings." <u>Id.</u> at 458. But reciting the warnings is not a magic spell that eliminates all manner of compulsion as to inoculate an interrogation from constitutional challenge. Punctilious compliance with <u>Miranda</u>'s prophylactic requirements is a precondition to admissibility, not a guarantee of admissibility. In <u>P.Z.</u>, the New Jersey Supreme Court recognized that although "<u>Miranda</u> established a per se rule to counteract the inherently coercive nature of custodial interrogations by law enforcement[,] it did not eliminate the due process requirement that all statements given during an interrogation must be voluntary." 152 N.J. at 113 (citing <u>Miller v. Fenton</u>, 474 U.S. 104, 109-10 (1985)).

Accordingly, in addition to determining whether police complied with <u>Miranda</u>'s prophylactic requirements, reviewing courts must consider whether the defendant's statements were "the product of an essentially free and unconstrained choice," or whether instead "the defendant's 'will [was] overborne and [their] capacity for self-determination critically impaired.'" <u>Ibid.</u> (quoting <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 225-26 (1973)). As

we have stressed, determination is made by weighing the totality of the relevant circumstances. See Nyhammer, 197 N.J. at 402-03 (noting that generally, when a court determines whether an interrogee has knowingly, intelligently, and voluntarily waived their right against self-incrimination in the setting of a custodial interrogation, it considers the totality of the circumstances); State v. L.H., 239 N.J. 22, 43 (2019) ("The voluntariness determination weighs the coercive psychological pressures brought to bear on an individual to speak against [their] power to resist confessing." (citing Dickerson v. United States, 530 U.S. 428, 434 (2000))).

Some relevant circumstances pertain to police conduct and other matters within police control, and others to the personal characteristics and background of the interrogee over which police have no control or even awareness. See M.P., 476 N.J. Super. at 290 (noting that characteristics of the interrogee remain relevant "notwithstanding they may not manifest outwardly during an interrogation"). As our Supreme Court recently observed, "factors commonly considered include the defendant's 'age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved.'" Bullock, 253 N.J. at 534 (quoting Nyhammer, 197 N.J. at 402).

It bears noting at this point that the "totality" of relevant circumstances includes two distinct categories: (1) factors relating to the questioning methods and tactics used by police interrogators (e.g., length of detention, repetitive and accusatorial questions, and trickery) and (2) factors pertaining to the personal characteristics and background of the interrogee (e.g., age, education, intelligence, experience with the criminal justice system, intoxication, and mental illness). The former category focuses on police conduct in the interrogation room, the latter on personal characteristics that suspects bring with them to the interrogation.

A rough analogy can be drawn to the two categories of factors that are used to determine the reliability of eyewitness identifications, as explained in State v. Henderson, 208 N.J. 208, 245-77 (2011). Some factors are under the control of the police officers who administer the eyewitness identification procedure, such as whether the photo array was properly composed, whether the procedure was electronically recorded, and whether the administrator followed a "double blind" procedure and provided appropriate instructions to the witness. These police-controlled circumstances are known as "system" variables. See id. at 248-61. Other relevant factors, known as "estimator" variables, relate to circumstances over which police have no control, such as

41                                                                              A-2287-22

lighting, distance, vision or memory disabilities, and the stress experienced by the witness at the moment of the observation. See id. at 261-72.

A witness's out-of-court identification may be found to be unreliable based on estimator variables even when the identification procedure was administered by police in accordance with the rules and standards. So too in the context of self-incrimination/voluntariness analysis, a defendant's waiver of rights or ensuing statement may be found to be involuntary despite the absence of improper police interrogation tactics. Stated another way, unlike the exclusionary rule remedy for violations of the per se Miranda rules, the decision whether to suppress a confession or inculpatory admission under TOC voluntariness analysis can account for, but does not hinge on, a finding of police wrongdoing.

## D.

### Heightened Protections Under New Jersey Law

Under New Jersey law, the rules governing the admissibility of custodial statements and admissions are strictly enforced. In State v. Erazo, our Supreme Court stressed that "[w]ith respect to the trial court's admission of police-obtained statements . . . an appellate court 'should engage in a "searching and critical" review of the record to ensure protection of a

42

defendant's constitutional rights.'" 254 N.J. 277, 297 (2023) (quoting Hreha, 217 N.J. at 381-82 (internal citation omitted)).

Furthermore, the substantive rights themselves are more protective under New Jersey law than under its federal counterpart. In State v. Vincenty, the Court reaffirmed that the "[New Jersey] common law privilege against self-incrimination affords greater protection to an individual than that accorded under the federal privilege." 237 N.J. 122, 132 (2019) (quoting In re Grand Jury Proc. of Guarino, 104 N.J. 218, 229 (1986)). The Vincenty Court emphasized that "[w]e have provided that protection because the right against self-incrimination is 'an integral thread in the fabric of [the] common law,' and 'one of the most important protections of the criminal law[.]' Accordingly, we maintain 'an unyielding commitment to ensure the proper admissibility of confessions.'" Ibid. (quoting State v. Hartley, 103 N.J. 252, 286 (1986); then Presha, 163 N.J. at 312; and then State v. Reed, 133 N.J. 237, 252 (1993)).

Notably, "[a]lthough the United States Supreme Court has held that the [S]tate must prove admissibility of a confession by only a preponderance of the evidence,[13] [the New Jersey Supreme Court] has held that the State must prove admissibility beyond a reasonable doubt." State v. Bey, 112 N.J. 123,

---

[13] See Colorado v. Connelly, 479 U.S. 157, 168 (1986).

134 (1988) (citations omitted); accord State v. O.D.A.-C., 250 N.J. 408, 420 (2022).

E.

Special Protections Afforded to Juveniles

The rules of engagement for police are not the same for adults and juveniles, and there are some relevant circumstances that uniquely apply to underage suspects. At the heart of this appeal lies the basic principle that New Jersey has "long accorded juveniles special protections when they are subjected to interrogation." State ex rel. A.W., 212 N.J. 114, 128 (2012); see also M.P., 476 N.J. Super. at 263 ("No one disputes that children are different from adults for purposes of determining the admissibility of admissions and confessions given to police." (citing A.W., 212 N.J. at 136)).

Those additional protections are needed because juveniles "are typically less mature, often lack judgment, and are generally more vulnerable to pressure than adults." M.P., 476 N.J. Super. at 263 (quoting State in Interest of A.A., 240 N.J. 341, 354 (2020)). Accordingly, "the greatest care must be taken to assure that a juvenile's admission is voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." Id. at 264 (quoting A.A., 240 N.J. at 354 (internal quotation marks and citation omitted)).

To that end, juveniles in this State have the right to have a parent or guardian present when they are interrogated. Presha, 163 N.J. at 322. In A.A., the Court recently confirmed that "[t]he protections outlined in Presha remain good law." 240 N.J. at 358.

We note the Presha doctrine applies to all interrogees under the age of eighteen.[14] The Court held, "[r]egardless of the juvenile's age, law enforcement officers must use their best efforts to locate the adult before beginning the interrogation and should account for those efforts to the trial court's satisfaction." 163 N.J. at 308 (emphasis added). Accordingly, the fact that an interrogee is close to the age of majority does not excuse the obligation police have under New Jersey law to make reasonable efforts to secure the participation of a parent or legal guardian. Stated another way, police may not subjectively determine whether a parent is needed based on their assessment of the juvenile's maturity. Rather, the right to have a parent attend exists up to the moment the suspect reaches the age of majority.

---

[14] The Presha Court imposed additional safeguards for juveniles under the age of fourteen, holding, "We will apply a different standard in that context, namely, the adult's absence will render the young offender's statement inadmissible as a matter of law, unless the parent or legal guardian is truly unavailable." 163 N.J. at 308. Those additional safeguards do not apply in this case.

However, in determining the impact of a parent-participation issue on the ultimate question of voluntariness, a reviewing court may account for a juvenile's age, maturity, and experience with the criminal justice system. In other words, those suspect-specific characteristics are accounted for, not in whether the juvenile is entitled to have a parent present, but rather in the weighing stage of the TOC analysis we summarized in Section II.B.

In Presha, for example, the Court "emphasize[d] that, because of his advanced age and the fact that he had been arrested on fifteen prior occasions, defendant was familiar with the criminal process at the time of his statement." 163 N.J. at 317. The Court ultimately ruled that the State had carried its burden of demonstrating the seventeen-year-old defendant voluntarily waived his rights, notwithstanding the absence of a parent, holding:

> [D]efendant's age and familiarity with the criminal process, his clear desire to be interviewed without a parent present, the presence of a parent at the outset of the questioning, and his fair treatment by police . . . compel us to conclude that defendant's will was not overborne by investigators, the critical factor in this inquiry.
>
> [Id. at 318.]

The Presha Court's ultimate holding underscores that the parental-participation rule "does not displace the totality-of-the-circumstances test but rather is a critical part of it." M.P., 476 N.J. Super. at 267. Indeed, although

the <u>Presha</u> Court ultimately affirmed the admissibility of the defendant's statement, as we have noted, it characterized the presence of a parent as a "highly significant factor" in the totality-of-the-circumstances analysis, adding that "[b]y 'highly significant factor' we mean that courts should give that factor added weight when balancing it against all other factors." 163 N.J. at 315.

F.

<u>Distinguishing Among the Different Parental Functions Served During a Custodial Interrogation</u>

In applying the <u>Presha</u> doctrine, we must consider what it means for a parent to be "present" or "absent," especially given the warning tendered in <u>State in re A.S.</u> that "mere presence of a parent is insufficient to protect a juvenile's rights." 203 N.J. 131, 148 (2010). The facts of the present case require us to identify and distinguish between the various functions a parent may serve at the outset of and throughout an interrogation session.

The <u>Presha</u> Court noted that an attending parent can "offer a measure of support in the unfamiliar setting of the police station." 163 N.J. at 314. In such a situation, the Court reasoned, "the parent serves as a buffer" between the juvenile and police and is "in a position to assist" the juvenile "in understanding their rights, acting intelligently in waiving those rights, and otherwise remaining calm in the face of an interrogation." <u>Id.</u> at 315. "By

elevating the significance of the adult's role in the overall balance," the Court held, "we are satisfied that the rights of juveniles will be protected in a manner consistent with constitutional guarantees and modern realities." Ibid.; see also A.S., 203 N.J. at 147-48 (reiterating these principles). In A.A., the Court recently amplified Presha, holding that the practice of providing an opportunity for the parent and child to confer privately after the administration of Miranda warnings "would enable parents to help children understand their rights and decide whether to waive them—as contemplated in Presha." 240 N.J. at 359.

As we have noted, in A.S., our Supreme Court commented that "mere presence of a parent is insufficient to protect a juvenile's rights." 203 N.J. at 148. "In order to serve as a buffer," the Court explained, "the parent must be acting with the interests of the juvenile in mind." Ibid. However, as the Court recognized, "[t]hat is not to say that a parent cannot advise [their] child to cooperate with the police or even to confess to the crime if the parent believes that the child in fact committed the criminal act." Ibid.; see also State ex rel. Q.N., 179 N.J. 165 (2004) (finding a juvenile's confession was voluntary even though the mother urged her son to confess and then left the interrogation room).

We glean from the case law that the "buffering" role contemplated in Presha entails at least three analytically distinct protective functions that a parent may perform during a child's custodial interrogation: (1) providing a supporting presence to help dispel the unfamiliarity and inherent coerciveness of a stationhouse interrogation; (2) providing assurances to the child that interrogators will be deterred from using overly aggressive, "third degree" tactics; and (3) providing advice to the child both on whether to initially waive Miranda rights and also on whether to assert a Miranda right during the ensuing interrogation.

The third function—giving meaningful and timely advice throughout the interrogation session—is distinct because it involves active participation, not just passive presence. A parent who interacts with the interrogating officers and child provides more than emotional support. The advisory role is especially important for purposes of the language proficiency issues raised in this case because that function presupposes the parent not only understands the child's legal rights but also understands the conversation in which those rights might be imperiled.

In M.P., we commented that "[t]he actual role played by a parent during a stationhouse interrogation—whether as a 'buffer' or instead as an adjunct law enforcement interrogator—is a fact-sensitive question to be determined on a

49

case-by-case basis." 476 N.J. Super. at 267. In other words, "a parent's participation may militate for or against a finding of voluntariness depending on the circumstances." Ibid. (citing A.A., 240 N.J. at 358 (noting the parent's conduct during the interrogation in that case "upended the model envisioned in Presha")).

Finally, with respect to the various roles that a parent can play while participating in a child's interrogation, we would be remiss if we did not note that in this case, the detectives treated Montiel as a potential witness, posing questions directly to her and soliciting her opinion on whether her son was the person shown in the surveillance videos they played during the interrogation session. At another point during the interrogation, in response to defendant's claim that he was asleep from 10:00 p.m. on the night in question until about 5:00 a.m. the next morning, when Montiel called him, Velarde asked Montiel in Spanish when she called her son and whether she still had a record of the call in her phone.

We are aware of no New Jersey precedent that addresses this situation. We note that here, Montiel's answers to the detectives' questions were not inculpatory; she steadfastly maintained that defendant was not the person depicted in the videos detectives showed her and her phone call log corroborated defendant's account. Accordingly, while the detectives' questions

to Montiel posed a risk of creating a rift between her and her son, as it happens, no conflict of interest came to fruition.

For that reason, we do not consider the detectives' questions posed to Montiel to be a relevant factor in this case. Cf. A.S., 203 N.J. at 154-55 (noting that a parent whose interests "clash" with the juvenile's due to the parent's relationship with the victim or another involved in the investigation might not be able to "fulfill the role envisioned in Presha"). We nonetheless caution that treating an attending parent as a fact witness, rather than as a buffer, is a risky interrogation practice, one that easily could turn the parent against the child and thereby "upend" the protective role contemplated in Presha. A.A., 240 N.J. at 358. Relatedly, if a parent were to provide an inculpatory answer to a police question, the practical effect might be to compel the child to respond to the parent's answer. Such compulsion would bear directly on the voluntariness of the child's response and ensuing statements.

III.

LANGUAGE BARRIERS UNDER NEW JERSEY LAW

Before turning to the intersection of language barriers and the parental function described in Presha, we consider how New Jersey self-incrimination law addresses language proficiency in general. Our Supreme Court has long acknowledged that "[t]he problem of communicating Miranda rights to non-

English-speaking defendants is important, particularly in a state with so diverse a population." State v. Mejia, 141 N.J. 475, 503 (1995), superseded by constitutional amendment on other grounds, N.J. Const. art. I, ¶ 12.  Miranda presupposes "meaningful advice to the unlettered and unlearned in language which [the defendant] can comprehend and on which [the defendant] can knowingly act." State v. Bode, 108 N.J. Super. 363, 367 (App. Div. 1970) (quoting Coyote v. United States, 380 F.2d 305, 308 (10th Cir. 1967)).  Cf. State v. Marquez, 202 N.J. 485, 508 (2010) (noting with respect to the police obligation to inform an arrested motorist of the consequences of refusing to take a drunk driving breath test that "reading the standard statement to motorists in a language they do not speak is akin to not reading the statement at all").  Our Supreme Court has thus acknowledged that a language barrier is among the factors a court may consider when evaluating the voluntariness of a Miranda waiver.  See State v. Tillery, 238 N.J. 293, 317 (2019) ("[C]ourts consider the explicitness of the waiver, language barriers, and the time lapse between the reading of Miranda rights and the actual questioning or incriminating oral statement." (emphasis added) (citation and internal quotation marks omitted)).[15]

---

[15]  We note that the New Jersey Judiciary's Language Access Plan (LAP) states that the Judiciary "shall provide equal access to court proceedings, programs

Most cases that discuss language barriers in the self-incrimination context focus on the language proficiency of the interrogee rather than a parent who attends a juvenile's interrogation. We find helpful guidance on this distinct question in State in Interest of J.F., 286 N.J. Super. 89 (App. Div. 1995). In that case, we concluded that the juvenile defendant's Spanish-speaking guardian, though physically present, was "effectively excluded" from

_____

and services for all people, including persons who are limited English proficient (LEP)" and requires interpretation services "[w]here an individual who is LEP needs an interpreter to understand and fully participate in the justice process." Admin. Off. of the Cts., Admin. Directive #21-23, NJ Judiciary Language Access Plan (LAP) 11 (Nov. 14, 2023). Similarly, N.J.S.A. 34:1-69.10 mandates the appointment of a qualified interpreter to assist a hearing-impaired parent of a juvenile: (a) in any case before any court or grand jury; and (b) at all stages in any proceeding of a judicial or quasi-judicial nature before any State agency or county or municipal governing body or agency.

While the LAP applies only to judicial or quasi-judicial proceedings, and has not been extended to stationhouse interrogations conducted by law enforcement officers, we believe the rights at stake during a custodial interrogation are comparable in importance to the rights at stake in judicial proceedings such as those before a grand jury. Furthermore, our Supreme Court, through case law and its rulemaking authority, has imposed procedural requirements on law enforcement agencies with respect to stationhouse interrogations. See, e.g., R. 3:17 (establishing standards for electronic recordation). We note that, in this case, there was testimony at the suppression hearing that there was no set procedure for police to decide when and how to provide a translation for the benefit of a parent. We believe it would be appropriate for the Supreme Court Committees on Criminal and Family Practice to consider the need for and benefit of rules regarding translation services for interrogees in general, and for parents or guardians of juvenile interrogees in particular, to facilitate their meaningful participation.

the interrogation because it was conducted entirely in English. Id. at 96. We nonetheless declined to hold that the juvenile's confession was per se inadmissible. Id. at 101.

In J.F., an English-speaking officer testified that during the interrogation, his Spanish-speaking colleague read the English-version Miranda form to the guardian in Spanish, and a waiver was obtained. The remainder of the interrogation was conducted in English, except that at the very end, the bilingual officer asked both the defendant and his guardian whether it was "a voluntary statement," in both English and Spanish. Id. at 95-96.

On appeal, we found that the transcript of the statement "reflect[ed] difficulty on [the guardian's] part in understanding the [Miranda] warnings and the waiver thereof." Id. at 95. We further commented that it "could as well be said" that because the interrogation was conducted in a language the guardian did not understand, she was "unable to provide any support, assistance, or guidance" to the defendant, and was "effectively excluded from his custodial interrogation." Id. at 96.

But we also determined that the record contained no indication that the defendant's statement was coerced, or that any "unfair procedures" were used to procure a confession. Id. at 100. We noted, for example, that the

54

questioning was not "lengthy" or "drawn-out," and did not involve improper "psychological pressures." Ibid.

We stated that we were reluctant to conclude that "a juvenile's confession is per se inadmissible" whenever a parent or guardian cannot "fully . . . effectuate[]" their role during the interrogation, particularly where the questioning is otherwise properly and fairly conducted. Id. at 101. We further held that despite the interrogating officers' "failure to ensure that [the guardian] could fully comprehend what was occurring during the interview by translating it for her into Spanish," her "presence alone may have provided some source of support for [the defendant], as well as a form of protective buffer from overbearing police procedures." Id. at 100. We noted that while the guardian "may not have been able to understand the words . . . certainly she could have observed the tone and demeanor during the questioning and would, thereby, have been alerted to the possibility of oppressive or coercive tactics employed." Id. at 100-01.

We agree with the J.F. court's conclusion that the failure to translate for an attending guardian or parent does not require automatic suppression, at least where the decision to conduct the interrogation in a language the guardian/parent cannot understand, without interpretation, is not deliberate— that is, for the purpose of functionally excluding them. Cf. Presha, 163 N.J. at

55

318 ("It is difficult for us to envision prosecutors successfully carrying their burdens in future cases in which there has been some deliberate exclusion of a juvenile's parent or legal guardian from the interrogation."). Nor do we disagree with the J.F. court's conclusion that the guardian's presence served a useful buffering purpose notwithstanding that she could not follow what was being said during the interrogation.

In reaching its conclusion, however, the J.F. court focused on only two of the analytically distinct buffering functions we have identified, namely, comforting support and deterring outwardly oppressive police tactics. The court did not consider in depth the guardian's potential role as an advisor—a protective function we deem to be potentially significant. We recognize that J.F. was decided before Presha and its progeny, and so the court did not have the benefit of more recent cases that explain, for example, that "the mere presence of a parent is insufficient to protect a juvenile's rights." A.S., 203 N.J. at 148. Thus, while we embrace many of the principles announced in J.F., we do not view it as the final word on how to approach parental-participation cases involving limited language proficiency.

IV.

DELIBERATE EXCLUSION

We next apply the general legal principles we have discussed regarding the impact of language barriers to the present facts. We begin by addressing defendant's contention that the detectives deliberately excluded Montiel from the interrogation session, relying in part on Presha's stern warning that "[i]t is difficult for us to envision prosecutors successfully carrying their burdens in future cases in which there has been some deliberate exclusion of a juvenile's parent or legal guardian from the interrogation." 163 N.J. at 318. We note that portion of Presha may have referred only to physical exclusion of a parent, which clearly did not happen here. However, we extrapolate from the rationale of Presha and its overriding objective to safeguard the protective role of a parent that the Court's concerns regarding "some deliberate exclusion of a juvenile's parent or legal guardian from the interrogation" (emphasis added) might apply to a parent who remains physically present in the interrogation room if interrogators purposefully exploit a language barrier by providing incomplete and untimely translation, thereby preventing a parent from giving timely advice.

We find further guidance on when a parent's absence is attributable to police conduct in A.W., 212 N.J. 114. In that case, a bilingual thirteen-year-

old juvenile confessed after his Spanish-speaking father agreed to leave the interrogation room. A.W. argued to the Supreme Court that "his father's absence was inappropriately procured by the detective's use of English at critical points in the interrogation to marginalize his father so that he left the room without fully understanding the implications of that choice." Id. at 134. The Supreme Court rejected that argument, reasoning:

> The detective's use of English while A.W.'s father was in the room was brief and A.W.'s father did not request that the detective translate the few words exchanged between her and A.W. that were spoken in English. Moreover, the vast majority of the statements that the detective made while speaking English were also spoken in Spanish either before or after that exchange. Nor did anything in the substance of those comments serve to marginalize A.W.'s father. In fact, the videotape shows a father who is fully engaged in listening to what his son had to say and not a man who is being excluded.
>
> [Ibid.]

In the present matter, we are unpersuaded that Montiel's partial understanding was the product of any deliberate decision or interrogation tactic attributable to the detectives. It was defendant, not the detectives, who chose to conduct the interrogation in English. The record suggests that the bilingual detectives were prepared to conduct the interrogation in Spanish. Presumably, moreover, defendant knew that his mother would have difficulty understanding the conversation.

58

We recognize, however, that although defendant chose to conduct the interrogation in English, the interrogating officers were still responsible for the manner in which the conversation was translated for Montiel's benefit. Having determined that some translation service was needed, it was incumbent upon the detectives to do it right. In Section V.C, we address whether the detectives' sporadic summaries were adequate to allow Montiel to follow the conversation. The key point for purposes of addressing defendant's deliberate-exclusion contention is that the trial court made no finding on whether the detectives chose the translation method deliberately, that is, for the purpose of excluding Montiel within the meaning of the stern warning in Presha, 163 N.J. at 218. We decline to speculate that the translation method used by the detectives was a strategic decision to keep Montiel from discouraging defendant from talking with them. We therefore are unpersuaded that Montiel was deliberately excluded within the meaning of the Presha warning.

V.

## FUNCTIONAL ABSENCE OF A PHYSICALLY PRESENT PARENT

TOC voluntariness analysis is by no means limited to circumstances that involve purposeful police misconduct. See M.P., 476 N.J. Super. at 290 (rejecting the State's argument that a reviewing court can disregard circumstances deemed relevant under the case law, such as the juvenile

59

interrogee's intelligence and education, on the grounds that those circumstances were not known by or noticeable to police). The fact and practical effect of the language barrier, not just its cause, must be accounted for under the TOC analytical paradigm.

Accordingly, we turn next to the more nuanced question of whether and to what extent Montiel was functionally absent for purposes of fulfilling defendant's Presha rights by reason of her limited English language proficiency. As will soon be apparent, this question is complex, involving several layers of analysis. We start, simply enough, by reaffirming our holding in J.F. that a parent's/guardian's language barrier does not categorically require suppression. 286 N.J. Super. at 101. Rather, Montiel's limited English language proficiency is a relevant circumstance that must be considered in the context of the TOC paradigm. The critical question is how much weight should be ascribed to that circumstance.

Before we get to that stage of our analysis, we must address two distinct foundational questions: first, did Montiel's limited English proficiency keep her from adequately understanding her son's Miranda rights as explained during the initial waiver colloquy; and second, did her limited English proficiency keep her from understanding the post-waiver conversation. The first question focuses on her ability to understand the law, the second on her

A-2287-22

ability to understand what was happening during the interrogation.   We address each fact-sensitive question in turn.

A.

Initial Waiver of Rights

With respect to the first question, the record supports the trial court's finding that Montiel understood her son's <u>Miranda</u> rights.  The officers told her they were going to read the <u>Miranda</u> form to defendant in English and they proceeded to do so.  Montiel interrupted to ask about the form, at which point defendant described some of the rights on the form to her in Spanish with additional explanation in Spanish from one of the officers.  The detectives told her that everything they had read to defendant in English was "on the paper" they had given her, referring to the Spanish-version <u>Miranda</u> form.  An officer asked, "Do you want me to read it in Spanish?"  She replied, "No.  It's okay already."  The officers then continued going through the English version of the form with defendant.  Both defendant and Montiel signed the English-version form.

After some additional discussion, the topic of the <u>Miranda</u> form resurfaced.  Detective Flores asked Montiel in Spanish if she "underst[ood] this form that [defendant] filled [out]," and asked if she had any questions.  Montiel replied, "Well, I—sin-since I've never filled that I don't really. . . "

61

Flores said that "in this country you have rights," and Velarde asked defendant, "Do you want me to read it to her in Spanish?" Defendant replied, "Yeah. Please. Please." Flores commented, "She can read it in Spanish," whereupon defendant explained, "She . . . don't know how to read that good."

Velarde proceeded to review the <u>Miranda</u> form in Spanish with Montiel, reciting the questions on the form and explaining that defendant had answered "yes" to each of them. Velarde asked Montiel whether she understood each right. Montiel answered, "Yes." Velarde also read the "waiver of rights" section of the form. Velarde then asked Montiel, "Is it okay for you?" to which she answered, "Yes." Flores asked defendant, "Do you have any questions on this thing? You sure?" and defendant replied, "Yes, sir." Furthermore, at the suppression hearing, Montiel testified that a detective read a form to her about her son's rights. When asked if she remembered if she understood those rights, she replied, "I think so, yes."

In these circumstances, we accept the trial court's determination that Montiel was apprised of the <u>Miranda</u> rights in Spanish. That factual finding, which is supported by sufficient credible evidence in the record, effectively mitigates Montiel's language barrier with respect to the initial waiver of defendant's rights.

## B.

## Ongoing Interrogation

That brings us to the more complex and nuanced question of whether Montiel was precluded from meaningfully participating in the ensuing interrogation by virtue of her language barrier. At the outset, we note the trial court determined that Montiel "understood she had the right to stop the questioning at any time although she was nervous."[16] Accepting the trial court's conclusion that Montiel understood this right, we proceed to the more critical fact-sensitive question, which is not whether she adequately understood the law, but rather whether she adequately understood the questions the detectives posed to her son and the answers he gave to them, all in English.[17]

---

[16] See Tillery, 238 N.J. at 315 ("Miranda imposes a fifth requirement: 'that a person must be told that [they] can exercise [their] rights at any time during the interrogation.'" (quoting Miranda, 384 U.S. at 479)).

[17] We note that the trial court found Montiel's testimony that she was unable to understand when her son and the police spoke in English "somewhat incredible." The trial court based its determination on "several occasions where [Montiel] would interject in Spanish information directly responsive to the questions being asked of her son in English." There was a specific instance in which police were discussing the placement of a surveillance camera and Montiel interjected in Spanish where certain cameras might be located. We note that the word "camera" has near-identical pronunciation in Spanish and English.

Although we might not have reached the same conclusion as the trial court with respect to Montiel's ability to understand English were it our

63

That question brings us back to the various "buffering" functions that a parent can perform while attending an interrogation session. A parent's language barrier affects these distinct roles differently. We are satisfied, for example, that a parent can, by their physical presence, provide "comforting support" to the child regardless of language proficiency. So too we are satisfied that a parent's physical presence might discourage police from using outwardly aggressive tactics. But mere presence certainly does not suffice with respect to the role of providing advice on whether to invoke a constitutional right or on how to respond to an interrogator's question. That role necessarily presupposes that the parent can understand the questions being propounded to their child. We deem the advisory function to be especially important among the various protective roles in part because it gives meaning to the principle explained in A.S. that "the mere presence of a parent is insufficient to protect a juvenile's constitutional rights." 203 N.J. at 148. The A.S. Court added, "the parent must be acting with the interests of the juvenile in mind." Ibid.

We recognize that A.S. can be distinguished on its facts because a central issue in that case was whether the parent had a conflict of interest,

_____
decision to make in the first instance, we accept and apply the trial court's factual/credibility finding in view of the clear rule announced in S.S., 229 N.J. at 380-81.

causing her to advance the interests of her grandson over A.S. by acting as an interrogator and by pressuring A.S. to confess. Id. at 145-46. But the critical lesson from A.S. for present purposes is that the Court emphasized the importance of the parent's advisory role, explaining:

> It is not enough, however, to simply reiterate our holding in Presha that a parent's role is a "highly significant factor" in assessing the totality of the circumstances surrounding a juvenile's confession without also elaborating on the role that Presha envisioned the parent serving. In Presha, we explained that "[t]he role of a parent in the context of a juvenile interrogation takes on special significance," because "[i]n that circumstance, the parent serves as advisor to the juvenile . . . ."

> [Id. at 148 (quoting Presha, 163 N.J. at 314) (emphasis added).]

We add at this point that the record clearly shows that Montiel wanted to play an active role and was fiercely protective of her son's interests. This is not a situation where an attending parent had a conflict of interest, see id. at 154-55; became an "adjunct law enforcement interrogator," see M.P., 476 N.J. Super. at 267; or otherwise showed a propensity to "upend" the protective role envisioned in Presha, see A.A., 240 N.J. at 358. The case-sensitive issue here is whether and to what extent Montiel's language barrier impaired her ability to perform the protective parental functions she clearly wanted to fulfill. While Montiel's language barrier might not have impaired the first two protective

functions, her inability to understand the interrogation conversation in real time could well have weakened her ability to provide her son with meaningful and timely advice.

The next obvious question is whether and to what degree her limited English proficiency <u>actually</u> impaired her ability to serve a meaningful advisory role.  That question requires us to consider the nature and quality of the translation services that were provided to her throughout the course of the approximately two-hour long interrogation.

C.

<u>Efficacy of the Translation Services Provided</u>

The record shows that the bilingual detectives occasionally summarized the conversation for Montiel.  For example, in a seventeen-minute-long exchange with defendant in English, the police asked him about his whereabouts on the day of the shooting, what he was wearing, and who he was with.  When defendant responded, the officers told him that everything he said was a lie and threatened to charge him with murder.  The entirety of this conversation was then summarized for Montiel in a forty-second synopsis in Spanish:

> Ma'am, um, we're explaining to him that we already
> know that he has a part on what we're investigating.
> At this moment he's telling us that he doesn't have . . .
> anything to do with nothing.  But we're going to . . .

A-2287-22

show him video because there's a video.  You know, he says that . . . he was sleeping and we know that he wasn't sleeping.

It also bears noting that the time intervals between translation episodes were not uniform,[18] again suggesting that translating for Montiel was more an afterthought than a core obligation to safeguard defendant's constitutional right to meaningful parental participation.

The State does not dispute that Montiel was provided only with periodic synopses of what was spoken in English.  The trial court found that detectives related "the sum and substance of their prior questions and answers with her

---

[18]  For example, in a three-minute English exchange, detectives repeatedly accused defendant of lying, told him he was either "the shooter or the driver," and said they could show him an incriminating video.  Defendant maintained his story.  Defendant then told his mother, in Spanish, "They're accusing me of killing somebody."  This was followed by a brief conversation in Spanish in which defendant retold his account of the night in question to Montiel, and Detective Velarde told her that "there is proof" and defendant was not there "without any reason."

In another three-minute segment, detectives showed defendant and Montiel surveillance footage while telling defendant, in English, that he appeared in the video wearing pants that matched his previous description. Detectives also repeatedly asked him, in English, "that's the house, right?" and "whose car is that?"  The conversation only shifted to Spanish when Montiel interrupted to ask if the detectives could make the screen brighter.  The detectives then told Montiel, in Spanish, that her son got into the car in the video, that they were asking him if he was "the one driving or the one who shot," and that he was "keep[ing] with his thing, 'I don't know.  I was sleeping. I was passed out.'"

son," but she was not given a literal, word-for-word translation of those questions and answers.

We see two distinct problems with the method used in this case to explain the conversation in Spanish for Montiel's benefit. First, the substantial editing process left it to the officers to decide what needed to be shared with Montiel and what would be redacted. In a high-stakes venue where words matter, and where proof of a defendant's guilt or innocence may very well hinge on the turn of a phrase, we believe it is inappropriate to delete any substantive part of a question or answer from the translation. We recognize from the transcript that the conversation was often repetitive. But the fact that questions and answers needed to be repeated is itself an indication of how the interrogation was going, and whether defendant, for example, was resisting giving police the answer they wanted to hear. We hold that it is not enough in these circumstances for a police interpreter to convey a general sense of what has been asked and answered. With constitutional rights at stake, a parent is entitled to more than a Cliff Notes abstract of the interrogation dialog.

We have little doubt that had this dialog occurred in a courtroom, a judge would not tolerate this quality of consecutive translation; while we do not suggest that interrogation-room translation must meet the standards for

 A-2287-22

courtroom translation, by any objective measure, this example is unsatisfactory.

Our concern regarding incomplete summarization is amplified when, as in this case, the redactions are left to the discretion of law enforcement officers who are, as the United States Supreme Court put it, "engaged in the often competitive enterprise of ferreting out crime."[19] Johnson v. United States, 333 U.S. 10, 13-14 (1948). Even assuming interrogating officers act in good faith, their assessment of what details are important for a parent to know necessarily reflects their own perspectives and interests.

The second problem is that the sporadic summarization procedure used in this case impaired Montiel's ability to respond in a timely manner to specific questions posed to her son or to specific answers that he gave. Here, the pauses between completed statements in English and their translation into Spanish was very substantial. If Montiel wanted to object to a question or wanted to advise her son not to answer and to immediately assert his right to remain silent, that objection or advice might come well after defendant had already answered the question, at which point the "cat would be out of the

---

[19] We do not mean to suggest that bilingual officers should not be allowed to serve as interpreters. The point rather is that whoever does the translation should be expected to translate everything that was said during the interrogation, not just selected highlights.

69 <span>A-2287-22</span>

bag." Cf. Bullock, 253 N.J.at 535 (noting in the context of a "two-step" interrogation that "after an accused has once let the cat out of the bag by confessing, no matter what the inducement, [the accused] is never thereafter free of the psychological and practical disadvantages of having confessed" (quoting State v. Carrion, 249 N.J. 253, 275-76 (2021))).

We do not mean to suggest a parent is constitutionally entitled to a "simultaneous" translation.[20] Defendant in his appeal brief advocates for neither simultaneous nor consecutive translation but rather calls for a method of interpretation that would allow for a parent's "near-contemporaneous" understanding.

We note the type and quality of translation provided in this case is starkly different from the situation in State v. Belliard, 415 N.J. Super. 51, 81 (App. Div. 2010). In that case, "[t]he entire interview was translated for

---

[20] We note that there are different types of translation, simultaneous and consecutive. In Diaz v. State, the Delaware Supreme Court explained that "[s]imultaneous interpreting is defined as 'rendering an interpretation continuously at the same time someone is speaking.' Consecutive interpreting is 'rendering statements made in a source language into statements in the target language intermittently after a pause between each completed statement in the source language.'" 743 A.2d 1166, 1182 n. 58 (Del. 1999) (internal citations omitted). See also Admin. Off. of the Cts., Admin. Directive #21-23, New Jersey Judiciary Language Access Plan 50 (Nov. 14, 2023) (explaining that in consecutive interpreting, "the speaker must pause for the interpretation to be put on the record," but in simultaneous interpreting, there are "no pauses for the interpretation").

defendant's mother as defendant spoke." Ibid. We concluded on those facts that there was "no basis to disrupt the trial judge's findings that defendant's statements were made voluntarily." Ibid. We recognize that any language barrier issues presented in this case would have been ameliorated by a similar translation method.

D.

Impact of the Language Barrier on the Parental Function

Our conclusion that the translation provided in this case was inadequate does not necessarily mean that Montiel was foreclosed from serving a meaningful role. As the trial judge correctly noted, we must consider the extent to which she needed translation assistance to actively participate in the interrogation. Stated another way, the inherent flexibility of TOC analysis requires us to do more than find that Montiel faced a language barrier. Without question, that barrier is a relevant circumstance. But we must go one step further and assess whether and to what extent her limited English proficiency actually impaired her ability to perform the Presha parental functions. We must, in other words, assign weight to this circumstance before we can register it on the TOC abacus. Here, there are mitigating, ameliorative circumstances, as found by the trial court, that lessen the impact of the flawed translation.

Notably, the trial court made a factual finding that despite the fact that Montiel spoke little or no English, she understood at least some of the conversation.[21] As we have noted, we might not have reached the same conclusion as the trial court with respect to Montiel's ability to understand the portions of the conversation spoken in English, but defer to the court's assessment because this is a factual/credibility finding as to which we must not substitute our judgment. See note 17. We acknowledge, moreover, that the trial court's finding is supported by the fact that she participated in the conversation in Spanish at several points. Whenever she interjected, the detectives and defendant switched to Spanish to speak to her. Further, Montiel on occasion offered meaningful comments, including admonitions to defendant not to "cover" for his friends, and support for defendant's requests that the detectives look for surveillance cameras.

We nonetheless conclude that the incomplete and delayed translation provided to Montiel impaired her ability to offer timely advice as she might have done if she more fully understood what was being said. That is not to suggest that she did not serve to some degree as a buffer between the

---

[21] Defendant highlights Detective Flores's remark to defendant that his mother "has no clue what the hell is going on." When read in the context of that portion of the interrogation, we agree with the State that Flores meant that Montiel had no clue about the crime that was under investigation, not that she had no clue as to what was transpiring during the interrogation session.

detectives and her son.  Cf. J.F., 286 N.J. Super. at 100-01 (noting that the guardian's presence provided some support even without a complete understanding of every word that was said in English).  Aside from the benefit of her comforting presence and as a potential guard against oppressive interrogation tactics, she did, after all, interject occasionally, as the trial court stressed.  The point rather is that Montiel, who was highly motivated to protect her son's interests, might have served a greater protective role but for her limited English language proficiency and the manner in which the detectives addressed her language barrier.

In reaching that conclusion, we acknowledge that it appears from the electronic recording of the interrogation that defendant was explaining the law and providing advice to his mother, rather than vice versa.  That fact is relevant in determining the weight given to the language-barrier circumstance in the TOC totaling process, offsetting to some degree the impact of the incomplete translation method.

Considering all of these factors, we conclude that Montiel's language barrier undermined the value of her participation and thus weighs against the State in the voluntariness calculus, although not heavily.  Because she did serve some buffering function, we decline to apply the full weight

73

contemplated in <u>Presha</u> when it held that parental absence is a "highly significant factor."  163 N.J. at 315.

VI.

<u>FAILURE TO PERMIT A PRIVATE PARENTAL CONSULTATION</u>

We next turn our attention to another relevant circumstance pertaining to Montiel's buffering role—one that does not involve her English language proficiency.  Defendant contends that suppression of his statement is further required because he was not given an opportunity to consult with Montiel privately before deciding whether to waive his <u>Miranda</u> rights and speak to the detectives.  We agree that defendant and his mother should have been provided an opportunity to confer privately after the administration of <u>Miranda</u> warnings, and we find that the lack of consultation "weigh[s] heavily" in the totality of the circumstances.  <u>A.A.</u>, 240 N.J. at 359.

In <u>A.A.</u>, our Supreme Court held that police should advise a juvenile of their <u>Miranda</u> rights in the presence of a parent or legal guardian before either undertaking any questioning or allowing the parent to speak with the juvenile. 240 N.J. at 358.  The Court held that police should then give the juvenile a "meaningful opportunity to consult with the parent or guardian in private about those rights."  <u>Ibid.</u>  The Court added:

> That approach would enable parents to help children understand their rights and decide whether to waive

74

them—as contemplated in Presha. If law enforcement officers do not allow a parent and juvenile to consult in private, absent a compelling reason, that fact should weigh heavily in the totality of the circumstances to determine whether the juvenile's waiver and statements were voluntary.

[Id. at 359 (emphasis added).]

In M.P., we determined that to the extent that A.A. "amplified the existing totality-of-the-circumstances test" by stating that a lack of a certain procedure should "weigh heavily" in that analysis, "its rationale should be given retroactive effect." 476 N.J. Super. at 293.[22]

In the matter before us, the detectives did not provide an opportunity for defendant and his mother to confer privately after the Miranda warnings were administered. We presume that any such conversation would have been in Spanish and would have afforded Montiel an opportunity to provide candid advice to her son on how to balance his desire to clear his name and encourage police to investigate other suspects against the risk of answering police questions. (With the benefit of hindsight, we know that defendant did unwittingly provide inculpatory information by admitting to what he was wearing on the day of the shooting.)

---

[22] The State in its appeal brief does not argue that the policy to permit a private consultation announced in A.A. on January 15, 2020, should not be applied retroactively to the May 1, 2017, stationhouse interrogation.

Nor are we convinced that the State has offered a "compelling reason" either to excuse the failure to provide an opportunity for a private conference or to refrain from according heavy weight to that circumstance. A.A., 240 N.J. at 359. The State argues that a private consultation was not necessary because defendant was sufficiently aware of his rights and the magnitude of the situation, such that he did not need an additional consultation with his mother. We are unpersuaded.

As we have noted, police may not subjectively determine whether a parent is "needed" based on their assessment of the juvenile's maturity, since any such exception could swallow the Presha rule, leaving it to the discretion of police to decide whether to contact a parent to attend. As a corollary to that principle, we hold that it is not for police to decide that a private post-warning consultation is unnecessary based on their assumption that a juvenile interrogee understands their rights. We reiterate that in this case, defendant occasionally explained his rights to his mother, rather than the other way around. But that fact does not establish that a private conversation between mother and son would have served no purpose. As the A.A. Court recognized, that conversation "enable[s] parents to help children understand their rights and decide whether to waive them." 240 N.J. at 359 (emphasis added). In sum, we decline to conclude—speculatively—that Montiel would not have

76                                                                    A-2287-22

been able to provide meaningful and potentially influential advice not only on whether defendant should waive his rights but also on what he might say to the detectives if he decided to speak with them. To hold otherwise would be to devalue the principle that a parent can aid their child in making intelligent decisions.

The State also suggests that defendant and Montiel's opportunity to privately confer <u>before</u> <u>Miranda</u> warnings were administered was sufficient. However, as we held in <u>M.P.</u>, "a private consultation between parent and interrogee before the <u>Miranda</u> waiver colloquy is not a substitute for a consultation after the <u>Miranda</u> warnings have been administered," as "[w]e cannot assume that parents know the <u>Miranda</u> rights—and thus can discuss them intelligently with their children—before those rights are recited by police." 476 N.J. Super. at 291-92. Indeed, Montiel testified that this was her first experience with a police interrogation.

Accordingly, pursuant to the <u>A.A.</u> Court's clear instruction, we conclude that the lack of a post-warning private consultation should "weigh heavily" against the State when the time comes for us to total up the circumstances militating for and against a finding of voluntariness.[23]

---

[23] We add that the failure to provide an opportunity for a private consultation is distinct from the circumstance(s) pertaining to Montiel's partial absence by

## POLICE COMMENTS REGARDING DEFENDANT'S DETENTION STATUS AND BURDENING THE INVOCATION OF HIS RIGHTS AGAINST SELF-INCRIMINATION WITH A THREAT OF DETENTION

Finally, we address two closely related circumstances that are relevant in the TOC voluntariness analysis but that do not directly relate to parental participation.[24]   Specifically, we consider whether one of the interrogating detectives misled defendant about his legal status and, in almost the same breath, burdened defendant's right to confer with counsel.

The pertinent facts can be quickly recounted.  When defendant was advised during the Miranda waiver colloquy that the interrogation would stop if he wanted a lawyer, he responded that he wished to continue with the interrogation.  Defendant then asked, "[s]o . . . if I wanna leave I could leave, right?"  The detective replied, "[i]f you wanna leave you can leave but you

_____

reason of her language barrier.  The A.A. private consultation rule applies after Miranda warnings are administered but before the substantive interrogation begins.  The weight we accorded to the language barrier issue was predicated solely on the impairment of Montiel's buffering role during the course of the substantive interrogation.  (As we noted in Section V.A, Montiel was adequately advised of defendant's Miranda rights in Spanish).  Thus, while both circumstances relate to parental participation, we are not "double counting" the failure to permit a private consultation and the limitations on Montiel's advisory role resulting from her language barrier.

[24]  Of course, any problematic police conduct that occurs during a stationhouse interrogation might be addressed and ameliorated by a parent as part of their buffering role.

must understand that when I leave this room . . . once you say you want a lawyer I gotta talk to my bosses to see what they [are] gonna do with you." Defendant shook his head and said he did not need a lawyer but asked again if he could "go home" if he wanted to leave. Flores said that this would depend on "what [they] talk[ed] about."

We consider two distinct legal questions arising from this portion of the interrogation session: (1) whether police misled defendant as to his legal status and (2) whether they undermined or burdened his right to counsel. Although we discuss these issues separately for purposes of clarity, in the final analysis, we combine them, treating them as a single relevant circumstance for purposes of assigning weight and completing the final TOC balancing step.

A.

General Principles

We begin by acknowledging general legal principles regarding ad hoc statements made by police during a Miranda waiver colloquy or ensuing interrogation. In M.P., we cautioned that "[w]hat police tell suspects during the Miranda waiver colloquy beyond reading verbatim from a form must be parsed closely." 476 N.J. Super. at 296. We added, "[a]n interrogating officer's impromptu response to a question can be problematic if it could

79

reasonably be construed to contradict, deprecate, or undermine the <u>Miranda</u> warnings." <u>Ibid.</u>

In <u>State v. O.D.A.-C.</u>, our Supreme Court stressed that "[c]omments that contradict and hollow out <u>Miranda</u> warnings can negate their effectiveness and cast doubt on whether a defendant fully understood and knowingly waived [their] rights." 250 N.J. at 423. The <u>O.D.A.-C.</u> Court added, "[t]hat said, we continue to consider the totality of the circumstances to decide whether the State has proven beyond a reasonable doubt that a defendant knowingly, intelligently, and voluntarily waived his rights." <u>Ibid.</u> The Court expressly "[d]ecline[d] to adopt a bright-line rule that would require suppression any time an officer makes an improper comment during an interrogation." <u>Ibid.</u> The Court reasoned, "[s]uch an approach would lead to the suppression of voluntary statements in a number of instances. In contrast, the totality-of-the-circumstances test can both root out improper police statements that result in an invalid waiver and recognize knowing and voluntary waivers." <u>Ibid.</u> <u>See also</u> <u>State v. Cooper</u>, 151 N.J. 326, 355 (1997) (holding that an interrogating officer's "misrepresentations alone are usually insufficient to justify a determination of involuntariness or lack of knowledge").

In <u>M.P.</u>, we also noted that in gauging the effect of a detective's remark, the detective's subjective intent is irrelevant. 476 N.J. Super. at 297. Rather,

"[w]hat matters is what [the detective said] and the impact [their] impromptu remark had on [the juvenile suspect's] understanding of his own rights."  Ibid.

B.

Misleading as to Arrest/Detention Status

We first address the concern that Detective Flores may have misled defendant by suggesting at the outset of the interrogation that he was free to leave.  We are skeptical that defendant could simply have walked out of the police station and therefore consider whether Flores's answer to defendant's question was a form of deception designed to induce defendant to waive his right against self-incrimination.

In State v. Diaz, we reiterated the long-accepted principle that "[p]olice are permitted, within limits, to use trickery or deception in the course of a custodial interrogation."  470 N.J. Super. 495, 524 (App. Div. 2022).  However, we drew "a fundamental distinction between police trickery with respect to the strength of the evidence against an interrogee on the one hand, and trickery with respect to an interrogee's 'true status' . . . on the other hand."  Id. at 525 (quoting State v. A.G.D., 178 N.J. 56, 68 (2003)).  Specifically, in Diaz, we concluded the police were not permitted to strategically withhold from the defendant that they were investigating the crime of strict liability for drug-induced death, N.J.S.A. 2C:35-9, leaving the defendant to believe they

were investigating the far less serious crime of drug distribution. Id. at 518-22.

In the matter before us, the detectives were forthright in telling defendant and his mother that they were investigating a May 15 homicide that occurred on Federal Street. While the circumstances in Diaz are thus distinguishable, we believe that the overarching concern about misleading a suspect about their "true status" is not limited to misstatements regarding the nature of the crime under investigation, but also includes misstatements about whether the suspect is or will be detained, especially when, as in this case, the interrogee repeatedly expresses a desire to go home following the interrogation.

In this instance, we note that Flores kept alive defendant's hope that he would go home after the interrogation, asking about two hours into the interrogation, "What if I told you there's a possibility you might not go home?" But toward the end of the interrogation, when defendant asked if he was being arrested, Flores replied, "I told you a couple of times already . . . yes you are," adding that this was based "on the evidence we have against you." The sequence of questions posed by defendant and answers tendered by the

82

detectives suggest that the decision to detain defendant had already been made, contrary to what detectives told him at the outset of the interrogation.[25]

While misleading defendant about this aspect of his legal status is problematic, that circumstance standing alone might not carry significant weight in our TOC voluntariness assessment. The real problem with Flores's comment at the outset of the interrogation that defendant was free to leave is that it set the plate for his immediately ensuing remark, which implied that defendant's arrest status might change for the worse if he terminated the interrogation prematurely by asking to confer with an attorney. Because the statement that defendant was free to leave and the statement regarding the effect of asking for a lawyer are so closely tied, to avoid what might be described as "double counting," we consider them to be a single circumstance

---

[25] Under New Jersey law, when a juvenile complaint or arrest warrant is filed, police may not interrogate the juvenile without the consent of counsel. See State ex rel. P.M.P., 200 N.J. 166, 178 (2009). Police and prosecutors therefore have an incentive to initiate and complete stationhouse interrogations before applying to a judge for a juvenile delinquency complaint or arrest warrant. Defendant does not argue—and therefore we do not address— whether the detectives deliberately delayed filing a delinquency complaint to avoid triggering defendant's right to counsel. Cf. State v. Sims, 250 N.J. 189, 213-16 (2022) (holding that police need only advise an adult interrogee of their charges if a criminal complaint or arrest warrant has been filed, but noting that if law enforcement officers deliberately delay seeking a warrant to avoid disclosing to the arrestee the charges they face, the trial court should consider evidence of such "bad-faith" conduct as part of the totality-of-the-circumstances.).

militating against voluntariness for purposes of assigning weight under the TOC paradigm.

## C.

### Burdening the Invocation of the Right to Counsel

We find it troubling that Detective Flores's response to defendant's question about whether he was free to leave suggested that the decision to release or detain him had yet to be made and might depend on whether defendant halted the interrogation by asking to confer with counsel. Even so, Flores's remark does not require automatic suppression. Rather, it is a circumstance to be considered as part of our TOC analysis. In reaching that conclusion, we draw a distinction between denying or disregarding a request to speak with an attorney—which triggers automatic suppression[26]—and undermining a Miranda right, which is treated as a factor in assessing the totality of the circumstances. In this instance, because defendant had just made clear that he was not asking for an attorney, Flores's remark was not a

---

[26] See Edwards v. Arizona, 451 U.S. 477, 484-85 (1981), as amplified by our Supreme Court in State v. Rivas, 251 N.J. 132, 154 (2022) (diverging from federal law and explaining that under New Jersey law, if a suspect's "'words amount to even an ambiguous request for counsel, the questioning must cease,' unless the officer makes additional neutral inquiries that clarify that the suspect desires to waive the presence of counsel" (citation omitted)).

response to an ambiguous request for an attorney that had to be clarified under New Jersey law. See Rivas, 251 N.J. at 154.[27]

The remark was nonetheless improper because it could reasonably be construed as a threat of repercussion if defendant were at any point to invoke his constitutional right to an attorney. See M.P., 476 N.J. Super. at 296 ("An interrogating officer's impromptu response to a question can be problematic if it could reasonably be construed to contradict, deprecate, or undermine the Miranda warnings."). Indeed, suggesting negative consequences—immediate incarceration—for invoking a constitutional right is a quintessential example of burdening that right.

Viewed from the opposite perspective, the detective's remark might also be construed to dangle the prospect of a form of leniency—release without charges—if defendant refrained from asking for a lawyer during the interrogation. That too is improper.

---

[27] We note that the Court in State v. Alston cautioned that officers may not use their obligation to clarify a suspect's ambiguous request by asking "questions that 'operate to delay, confuse, or burden the suspect in [their] assertion of [their] rights.'" 204 N.J. 614, 623 (2011) (emphasis added) (quoting State v. Johnson, 120 N.J. 263, 283 (1990)). In State v. Dorff, we "interpret[ed] that important admonition to prohibit interrogating officers not only from posing questions that burden the suspect in asserting [their] rights, but also from . . . making comments that effectively burden the assertion of the suspect's right to speak with an attorney." 468 N.J. Super. 633, 647-48 (App. Div. 2021) (emphasis added).

In Hreha, our Supreme Court provided general guidance on how to assess a promise of leniency for purposes of determining its impact on the voluntariness of a suspect's confession. 217 N.J. 368. The Hreha Court noted that a defendant's confession may be found to be involuntary if the interrogating officers extended a promise so enticing as to induce that confession. Id. at 383. In L.H., the Court explained that a promise of leniency is but "one factor to be considered in determining voluntariness." 239 N.J. at 46. A reviewing court must weigh the enticement of the promise against the defendant's power to resist. Id. at 43. The Court in that case held that a false assurance that if defendant told the truth he would not go to jail directly negated the Miranda warnings and induced defendant to confess. Id. at 48-49.

Whether viewed as a threat of punishment for exercising a constitutional right or an offer of a reward for waiving that right, or both, we deem the detective's remark to be improper. Our Supreme Court in O.D.A.-C. recently compiled a non-exhaustive list of instances where interrogator comments contradicted or otherwise undercut the Miranda warnings. 250 N.J. at 421-23. We now add to that list.

Furthermore, we deem this circumstance to be highly significant on the question of voluntariness. Indeed, it comes close to providing an independent basis to suppress defendant's statement. See Bullock, 253 N.J. at 534 (noting

A-2287-22

that even one relevant circumstance may permit the conclusion that a confession was involuntary). Although Flores's troubling remark was brief, it came at a critical juncture—the point during the Miranda rights colloquy when the officer was explaining defendant's right to confer with an attorney. The impact of Flores's remark is clear, as shown by defendant's animated and immediate response, which was, "No. . . I don't need a lawyer. I'm sayin' like, if I wanna go home. . . I wanna leave, like right—right here . . ." Defendant clearly understood Flores to be explaining the negative consequences of asking for an attorney and wanted to avoid those consequences by stressing that he was not asking to speak with counsel. We reiterate that in gauging the effect of Flores's remark with respect to the question of voluntariness, the detective's subjective intent is irrelevant. See M.P., 476 N.J. Super. at 297. In other words, it does not matter whether Flores intended to dissuade defendant from asking to confer with a lawyer. Rather, "[w]hat matters is what [the detective said] and the impact [his] impromptu remark had on [defendant's] understanding of his own rights." Ibid.

We therefore give Flores's remark highly significant weight under the TOC paradigm given the heightened importance accorded under New Jersey law to the right to confer with an attorney. See State v. Alston, 204 N.J. 614, 621 (2011) (describing the right to counsel to be fundamental under New

Jersey law).  We also take note that by his repeated questions to the detectives about his present status, it was clear that defendant placed great importance on being released following the interrogation.  With respect to this circumstance, therefore, we see no mitigating facts that lessen the impact of the implicit threat/promise on defendant's decision whether to invoke his <u>Miranda</u> rights. And at the risk of "double counting" a circumstance we have already accounted for, we note in the interest of completeness that defendant was effectively denied meaningful assistance or support from his mother with respect to this specific threat/promise because she was not in the room at the time, and neither defendant's question nor the detective's troubling response was ever translated for her.

## VIII.

## <u>TOTALING THE RELEVANT VOLUNTARINESS CIRCUMSTANCES</u>

The time has come for us to add up the relevant circumstances militating for and against the State.  We emphasize that there is no mathematical formula to apply, no statistical technique for "norming" an arithmetic score, and no algorithm or evidence-based decision-making framework to inform our judgment in balancing competing circumstances that are as qualitatively different from each other as apples and oranges.

A-2287-22

We begin by summarizing the circumstances that support the trial court's finding of voluntariness. As in both <u>Presha</u> and <u>J.F.</u>, the record in this case contains no evidence of improper coercive police tactics during the course of questioning, putting aside the burdening of the right to counsel before substantive questioning commenced as addressed in Part VII.[28] We do not mean to suggest, however, that the detectives did not use tactics that exerted psychological pressure on defendant to change his story and confess. Throughout much of the interrogation, the detectives repeatedly told defendant that they knew he was lying to them and that they knew he was involved in the shooting. We believe these constitute "persistent techniques designed to 'wear down' the interrogee." <u>State v. Amang</u>, 481 N.J. Super. 355, 392 (App. Div. 2025) (citing <u>Rivas</u>, 251 N.J. at 155 (quoting <u>Smith v. Illinois</u>, 469 U.S. 91, 98 (1984))).

The detectives' dogged persistence, while by no means inappropriate per se, cannot be assessed in isolation from the relevant factors that militate strongly against the State. Rather, as part of the "totaling" step in the TOC analysis, we must consider the dynamic, synergistic effect of the various

---

[28] In light of that burdening of defendant's right to confer with an attorney, we are reluctant to characterize the situation as "fair treatment by police," which is one of the circumstances the <u>Presha</u> Court considered in concluding that the "defendant's will was not overborne by investigators." 163 N.J. at 318.

relevant factors as they bear on the ultimate question of whether defendant's will was overborne. Notably, three police-controlled circumstances in this case—failing to adequately translate for Montiel, failing to provide an opportunity for a private post-warning conference between defendant and Montiel, and burdening defendant's right to ask to confer with counsel—collectively made defendant more vulnerable to lawful but calculated interrogation tactics designed, in this instance, to convince him to admit that he was lying when he repeatedly claimed, in response to the detectives' repetitive questions/comments, that he had taken Percocet, passed out, and was not involved in the shooting. The issues relating to parental participation, for example, deprived defendant not only of the benefit of his mother's timely advice but also prevented her from telling the detectives to stop repeating accusatory comments concerning defendant's insistence that he had passed out.

Even more significantly, the improper burdening of defendant's right to interrupt the interrogation to confer with counsel might have inhibited defendant from exercising that right earlier,[29] inducing him to endure the detectives' repeated accusations he was lying in the hope and expectation that

---

[29] We are mindful that defendant's admission concerning the clothes he was wearing was made before the detectives told defendant they knew he was lying. However, the entire (redacted) recording was played to the jury, not just his admission concerning the pants he was wearing on the day of the shooting.

he would be released so long as he was not the one to terminate the session. As we have noted, that circumstance is especially concerning and is nearly sufficient by itself to render defendant's statement involuntary.

However, on the other side of the ledger, the interrogation was not unduly long, and defendant was given several comfort breaks and food on at least two occasions. Furthermore, the trial court found that defendant remained "calm and composed" during questioning, that he did not appear to be "fearful or fazed," and that he consistently maintained his version of events when the officers pressed him.

We are especially mindful that the trial court had the opportunity to view the electronic recording of the stationhouse interrogation and thus was able to ascertain "defendant's overall deportment and conduct as well as the officers' demeanor and conduct throughout the custodial interrogation." See A.M., 237 N.J. at 401. The recording confirms that defendant was persistent in his assertion of innocence once he was told he was a suspect in the drive-by shooting. See M.P., 476 N.J. Super. at 300 (highlighting that M.P. wanted to speak to police to explain his limited role in the murder under investigation).

It is not lost on us that the question of whether an interrogee's will was overborne is "the critical factor in this [voluntariness] inquiry." Presha, 163 N.J. at 318. See also O.D.A.-C., 250 N.J. at 420 ("Due process requires the

State to 'prove beyond a reasonable doubt that a defendant's confession was voluntary and was not made because the defendant's will was overborne.'" (quoting L.H., 239 N.J. at 42)).  But outward appearances may not present a complete picture of what an interrogee is thinking and what might be motivating them to engage in conversation with police.  As we noted in M.P., some circumstances "remain relevant notwithstanding they may not manifest outwardly during an interrogation."  476 N.J. Super. at 290.  Defendant may have been "calm," "composed," and "at ease," as the trial court found, but still operating under a misapprehension that if he asked for a lawyer he would be arrested.

That brings us back to the factors arrayed on the other side of the voluntariness ledger.  As we have noted, some circumstances carry highly significant weight by operation of case law.  Montiel's language barrier impaired her ability to perform the buffering function envisioned in Presha, although the weight we ascribe to that factor is offset, for reasons we have explained, so that it does not weigh as heavily against the State as it would had she been completely excluded or ignored.  The failure to provide defendant and his mother an opportunity to consult privately after the administration of the Miranda warnings, in contrast, is a comparatively straightforward factor that "weighs heavily" against the State in accordance with the ruling in A.A.

And most significantly, the detective's inappropriate remarks to defendant that undermined and burdened his right to confer with counsel weigh heavily against the State in our view.[30]

The State has cited no published precedent in this State where the Supreme Court or Appellate Division found a statement to be admissible in the face of two "highly significant" circumstances militating against a finding of voluntariness.[31] We reiterate that TOC analysis goes well beyond counting the absolute number of factors arrayed on either side of the voluntariness ledger, see Bullock, 253 N.J. at 534 (quoting Hreha, 217 at 384).[32] But in this instance, the presence of two heavily-weighed circumstances is significant, and, ultimately, is more than the State can overcome.

---

[30] As noted in Section VII.B, we have essentially combined the detective's two, near-simultaneous remarks, treating them as a single circumstance militating against voluntariness.

[31] Here, we have the failure to provide for a private parent-child consultation and the burdening of the right to counsel as separate circumstances both rated as highly significant. We also have the language-barrier impairment of the parent's advisory role, which militates against the State but in this instance carries less weight than the other concerning circumstances.

[32] In instructing reviewing courts to conduct a qualitative rather than quantitative assessment, the Court in Hreha meant that courts cannot just add up the absolute number of factors listed on each side of the ledger. See also State v. Kruse, 105 N.J. 354, 363 (1987) (noting that sentencing decisions are based on a qualitative rather than quantitative analytical process).

In applying the qualitative assessment required in TOC analysis when, as here, there are separate factors weighing against the State based on police conduct, a rough analogy can be drawn to the cumulative error doctrine. In State v. Butler, our Supreme Court recently explained that when assessing the combined effect of several prosecutor/trial court errors, "[w]e do not focus our analysis on the number of mistakes but rather consider whether the errors together amount to an injustice." __ N.J. __, __ (2026) (slip op. at 33) (citation omitted). The Court added, "[w]here an error involves a constitutional right, reversal is warranted unless we can conclude beyond a reasonable doubt that the cumulative errors were harmless." Ibid. (citation omitted).

Here, the circumstances that involve problematic police conduct, whether in the form of commissions (e.g., improperly burdening the right to counsel) or omissions (e.g., failure to provide an opportunity for a private parent-child consultation after warnings are given but before a waiver is executed and failure to adequately translate for a parent throughout the course of the interrogation), have more impact than the relevant factors in this case that suggest voluntariness, such as providing food and comfort breaks, and defendant's outward appearance of being "calm," "composed," and "at ease" as found by the trial court.

Relatedly, the fact that defendant appeared to want to give—and repeat—his account of the night in question was itself a response to the detectives' repetitive and forceful assertions that he was lying to them when he told them that he had taken Percocet and was passed out. While that interrogation tactic is not inappropriate, it did put pressure on defendant to relent and abandon his claim that he was sleeping when the shooting occurred.

When the circumstances militating against the State are viewed together, we are led to conclude that the prosecution did not meet its burden of proving that defendant's waiver of rights and ensuing statement were given voluntarily under New Jersey law, which, we cannot overstate, requires the State to prove voluntariness beyond a reasonable doubt. See O.D.A.-C., 250 N.J. at 413. Applying that elevated standard of proof and given that we decide the ultimate question of voluntariness de novo, we are constrained to reverse the order denying defendant's suppression motion.

IX.

HARMLESS ERROR

Defendant argues that the admission of his stationhouse interrogation statement was reversible error because "while [he] did not confess during the interrogation, the State clearly saw the statement as inculpatory, given their decision to play it in its entirety at trial." We note that while the State

95

contends the statement was properly admitted, it does not respond to this contention or argue in the alternative that admission of the statement was harmless. See New Jersey Dep't of Env't Prot. v. Alloway Twp., 438 N.J. Super. 501, 505 n.2 (App. Div. 2015) ("An issue that is not briefed is deemed waived upon appeal.").

Constitutional errors are considered "fatal error, mandating a new trial," unless [the court] can determine that the error was "harmless beyond a reasonable doubt." State v. Cabbell, 207 N.J. 311, 338 (2011) (citations omitted); see also State v. Carlton, 262 N.J. 629, 642 (2026) ("[B]efore a constitutional error can be considered harmless, the court must be convinced 'beyond a reasonable doubt' that the error did not affect the outcome.") (citation omitted). Here, defendant did not confess. On the contrary, he steadfastly asserted his innocence, but, as it turned out, unwittingly provided inculpatory evidence to the State by admitting to the clothing he was wearing on the day of the shooting. The importance of this evidence is shown not only by the fact that the prosecutor played the entire (admissible) portion of the electronic recording of the interrogation for the jury, but also by the prosecutor's comments in summation. The prosecutor highlighted statements defendant made during the interrogation in his closing argument, urging the jury to focus on defendant's admission as to the pants he was wearing on the

day of the shooting. That admission was significant because the State's identification proofs were not overwhelming. There was no surveillance video of the shooting, only of the suspected crime vehicle traveling to and from the area of the crime scene. No eyewitness to the shooting identified defendant or Vargas. There was no forensic evidence. The surveillance videos were grainy, and the only trial witness who identified defendant from the pieced-together surveillance videos was an officer who knew defendant from his participation in a junior police program when he was ten or eleven years old.

Defendant's admission was therefore impactful in a case that hinged on proving the identity of the culprits based on video surveillance evidence. In these circumstances, the admission of the statement was not harmless beyond a reasonable doubt. Accordingly, we are constrained to vacate defendant's convictions and remand for a new trial.

## X.

## REMAINING TRIAL ISSUES

Because we overturn defendant's convictions and remand for a new trial based on the trial court's pretrial suppression ruling, we need not reach defendant's contentions regarding subsequent trial errors. We address all but one of those issues in codefendant Vargas's appeal, and our opinion in that case can provide guidance to the trial court on remand in this case as needed.

However, Vargas does not contend on appeal, as does defendant, that the trial court "committed reversible error by granting the jury unfettered access to the [S]tate's surveillance video compilation during deliberations." We therefore take this opportunity to provide guidance to the trial court on that contention for purposes of a retrial.

The admission of video surveillance evidence has become commonplace at criminal trials—a trend that no doubt will accelerate as more governmental, commercial, and residential surveillance cameras are installed across the state. While the final word has not been written on the multitude of jurisprudential and practical issues surrounding the admission, narration, and playback of surveillance video evidence, the case law as it presently stands suggests, as a general principle, that video playbacks should be conducted in the courtroom under the supervision of the judge and in the presence of counsel. See State v. Knight, 477 N.J. Super. 400, 405 (App. Div. 2023), aff'd, 259 N.J. 407 (2024) (holding that "trial courts in their discretion may grant a jury's requests during deliberations to replay the videos in [slow motion or at other varying speeds, or with intermittent pauses] one or more times, provided that the playbacks occur in open court under the judge's supervision and in the presence of counsel") (emphasis added).

Our opinion in Knight specifically addressed the potential prejudicial effects of slow motion and other modifications to video surveillance footage. Its qualifying language—"provided that the playbacks occur in open court under the judge's supervision and in the presence of counsel"—creates a bulwark against modifications that alter video footage so substantially as to effectively create new evidence. In affirming our decision, the Supreme Court stressed in this regard that "some [video playback] tools or functions may be so specialized that their usage constitutes an alteration of evidence, or the creation of new evidence." Knight, 259 N.J. at 413. On the facts presented in that case, the Supreme Court affirmed the trial court's decision to allow the jurors to repeatedly review the surveillance footage in the courtroom, reasoning that "[s]lowing the video down, a familiar adjustment in video playback, did not change or distort the evidence but simply aided the jury's examination of what took place in the video by playing it at an easily discernable pace." Id. at 412-13.

Unlike the matter now before us, Knight did not involve a situation where the trial court allowed the jury to watch the video evidence in the jury room. We therefore had no occasion to consider whether other safeguards besides direct supervision/control by the trial judge might be adequate to prevent jurors from improperly modifying the evidence—the root concern in

Knight—were they to be entrusted with viewing video evidence in the jury room.  That is an important question, especially in light of modern realities, because it can hardly be disputed that our system of justice is well served when jurors meticulously study disputed evidence.

But this is not the case to tackle that question.  Because we are not required in the matter before us to rule on defendant's trial-error contention, we decline to break new ground on the question of whether, in what circumstances, and with what limitations/instructions a jury may be provided with a video player to review non-audio surveillance video in the jury room.  However, to provide guidance to the trial court and parties on remand, we offer the following comments concerning a different means—one that is already well supported in the case law—by which the jury may carefully study videographic evidence at its own pace and in the privacy of its secret deliberations.

Many of the concerns regarding jury room playback might be avoided by admitting into evidence carefully selected "screenshots"—still-frame photographs taken from the video recording that is played at trial.  Indeed, one or more carefully selected freeze-frame screenshots may afford an even better opportunity for the jurors to meticulously scrutinize an image when, as here, the surveillance footage is being offered to identify an individual.  Cf. Boland

v. Dolan, 140 N.J. 174, 182-83 (1995) (holding that "[t]he use of a magnifying glass by jurors for exhibits properly introduced at trial is within the trial court's discretion" and citing out-of-State authority for the proposition that a "jury's use of [a] magnifying glass to examine photographs was 'the mere taking of a more critical examination of an exhibit,' not [an] introduction of new evidence") (internal citation omitted).

This alternative approach rests on well-settled precedent. It is axiomatic, for example, that trial courts have discretion to admit into evidence still photographs that are relevant and properly authenticated. See State v. Thompson, 59 N.J. 396, 420 (1971) ("It has long been the rule in this State that admissibility of photographs . . . rests in the discretion of the trial court") (collecting cases); see also Brenman v. Demello, 191 N.J. 18, 30 (2007) (explaining that photographs are admissible if they are relevant, their probative value is not outweighed by the risk of undue prejudice, and they are properly authenticated as a substantially accurate representation of what they depict). Indeed, we suspect that photographs have been introduced as trial exhibits for nearly as long as photography has been around.

It is also well established that a photographic exhibit can be "published" to the jury, meaning not only that it will be passed among the jurors while they sit in the jury box, but also may be provided to them to review in the jury room

101

at their own pace.  See R. 1:8-8(a) ("The jury may take into the jury room the exhibits received in evidence").  This time-honored practice affords jurors the wherewithal to meticulously scrutinize an exhibit and engage in a vigorous contemporaneous debate over its meaning and relative importance in the privacy of the jury room.  On remand, the trial court and parties should consider this anodyne option at the retrial.

Reversed and remanded for proceedings consistent with this opinion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division